UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL LANDRY, and | ) | |
| TREADWELL FRANKLIN INFASTRUCTURE | ) | |
| CAPITAL LLC, | ) | CIVIL ACTION |
| | ) | NO.: |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WORLD MARINE OFFSHORE A/S, WORLD MARINE | ) | |
| OFFSHORE LLC, LARS CHRISTIAN ZOHNER, HANS | ) | |
| SCHNEIDER and JIMMY KRISTENSEN, | ) | |
| Defendants. | ) | |

**PLAINTIFFS' COMPLAINT**

Plaintiffs, Michael Landry ("Landry") and Treadwell Franklin Infrastructure Capital LLC

("TFIC")(collectively "Plaintiffs") bring this action against World Marine Offshore A/S

("WMO"), World Marine Offshore LLC ("WMO LLC"), Lars Christian Zohner ("Zohner"),

Hans Schneider ("Schneider") and Jimmy Kristensen ("Kristensen") state as follows:

**PARTIES**

1.      Landry is an individual who resides in Marshfield, Massachusetts.

2.      TFIC is a Delaware Corporation with a principal place of business located at 40 Forest

        Falls Drive, Suite 2, Yarmouth, Maine 04096.

3.      WMO is a Denmark corporation with a principal place of business located at Torkesaj 1

        DK-6700, Esberg, Denmark.

4.      WMO LLC is Delaware limited liability company and wholly owned subsidiary of

        WMO.

5.      Zohner is a resident of Denmark and originally held himself out as part of a group that

        held 50% of WMO shares.

6.      Kristensen is a resident of Denmark and is a shareholder in WMO.

7.      Schneider is a resident of Denmark and the current CEO of WMO.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332

        because the Plaintiffs and Defendants are citizens of different stat4es and the amount in

        controversy exceeds $75,000.

9.      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.

        §1367.

10.     This Court has personal jurisdiction over each of the Defendants by virtue of the

        Massachusetts long arm statute, Mass. Gen. L. c. 223A, §3.  The conduct of each of the

        Defendants articulated herein caused and continues to cause damage to the Plaintiffs, all

        which occurred within the Commonwealth of Massachusetts.  WMO and WMO LLC

        executed contracts submitting themselves to Massachusetts jurisdiction.   Zohner,

        Kristensen and Helle Els, who are employees and or shareholders of WMO and WMO

        LLC, physically came to Massachusetts to conduct business either for WMO or his or her

        own benefit.

11.     Venue is proper in this District because all the events that give rise to this action occurred

        within this District and all parties agreed to this District being the proper venue.

## THE JONES ACT

12.     The Jones Act generally prohibits a maritime vessel from providing any part of the

        transportation of merchandise by water—or by land and water—between points in the

        United States, either directly or via a foreign port, unless the vessel is "coastwise-

        qualified," i.e., U.S.-built, U.S.-registered, and U.S.-owned. 46 U.S.C. § 55102(b)

        (formerly 46 U.S.C. app. § 883).

13.   The Jones Act was enacted to encourage and aid in the development of a vibrant U.S. maritime industry.  46 USC § 50101.

## FACTUAL BACKGROUND

14.   In October of 2016, Landry established Patriot Offshore, Inc. ("POI") to build and operate wind farm support vessels.

15.   Landry spent a considerable amount of time developing a network, eventually meeting Zohner who was then CEO of WMO.

16.   WMO is a Danish shipping company that was established in 2012 to meet the increasing demand for cost effective, safe and efficient solutions in offshore crew and cargo transfers.

17.   At all relevant times, WMO helds itself out as providing a wide range of services for the offshore wind market, from offshore crew transfer, offshore support, offshore standby services to ferry services and more.

18.   WMO has a versatile fleet specialized in effectively transferring crew and cargo to and from offshore wind turbines.

19.   WMO brags that it provides high performance with its variety of Crew Transfer Vessels ("CTV") in its fleet.

20.   It is no secret that wind farms are happening off of the Massachusetts coast.

21.   As a foreign company owned by non-United States citizens, WMO cannot actively engage in the wind farm work happening off of Massachusetts or anywhere else in the United States due to the Cabotage laws of the Jones Act.

22.  On August 30, 2020, WMO and POI signed a Joint Venture Consortium Declaration upon submission of an original bid to Vineyard Wind, LLC ("VW") for Offshore Logistics Tender, which bound WMO and POI to the official bid to VW.

23.  Landry worked with Zohner and others from WMO to form a joint venture that was Jones Act compliant whereby WMO would:

   a.  WMO would be a financing resource;

   b.  WMO financials would be provided to all clients with proposals;

   c.  WMO would provide the management expertise, Certification, Safety Management Systems, Vessel Management Systems, including International Organization for Standardization ("ISO") Certifications.

24.  While working with Zohner in WMO's offices, Landry was introduced to some of WMO Board of Directors.

25.  On March 8, 2021, Patriot Offshore Marine Services, LLC ("POMS"), Patriot Offshore Holding 1, LLC I("POH1") and Patriot Offshore Holding 2, LLC ("POH2") filed Certificates of Organization with the Commonwealth of Massachusetts.

26.  The Parties joint venture was structured with these companies in order to accommodate WMO's desire to be a 49% owner in the aggregate of POMS and Landry to own 51%.

27.  On May 10, 2021, a best and final offer was submitted by POMS to VW for the Offshore Logistics Tender.

28.  On July 2, 2021, WMO added POMS to its ISO Certifications.

29.  On July 2, 2021, POMS was awarded the Offshore Logistics Tender Contract from VW.

30.  On or about July 15, 2021, George Campbell, partner of TFIC, met with Zohner, and Jimmy Kristensen, in Denmark to discuss the essence of a future partnership.

31.     Later in July of 2021, Landry and WMO engaged with TFIC as a potential partner in POMS.  TFIC was to raise capital, in addition to WMO's portion.

32.     TFIC was to raise the capital through its funding partners, who would be included in POMS as Limited Partners ("LP").

33.     TFIC would not formally initialize the capital raising process until an agreement or a memorandum of understanding was executed amongst Landry, TFIC and WMO and a formal commitment was made to include TFIC in POMS.

34.     August 10, 2021, POMS signed a Letter of Intent with General Electric ("GE") for the provision of two CTV's.  The Letter of Intent stipulated that GE and POMS intended to enter into a Charter Party agreement once GE received a Notice to Proceed from VW.

35.     The Letter of Intent stated that POMS would begin the vessel engineering and design work as part of the construction process for the vessels, ahead of signing the final Charter Party agreement.

36.     Landry and Zohner both signed the Letter of Intent and POMS engaged with the vessel designer and shipyards to complete engineering and design work.

37.     On August 12, 2021, POMS entered into a Charter Party agreement with Vineyard Wind 1, LLC ("VW1") to have a 27-meter Incat Crowther CTV constructed at Gladding Hearn Shipyard ("GH") with a delivery date of June 1, 2023 in order to support the construction and Operation and Maintenance phase of the VW1 offshore wind farm.

38.     The Charter Party with VW1 stipulated that WMO would assume the role of providing the Parent Company Guarantees ("PCG").

39.     POMS was given 60-days from the date of execution of the Charter Party, to provide a signed PCG from WMO.

40.     On August 12, 2021, POMS entered into a Letter of Intent (LOI) with GH to construct the Incat CTV.

41.     On August 16, 2021, Kristensen arrived in the US to conduct client meetings, shipyard visits, and partnership meetings with TFIC.

42.     Landry and Kristensen traveled around the country together to conduct client development and other meetings.

43.     On August 18, 2021, WMO wire transferred $70,000 USD to POMS and POMS, in turn, made the Initial LOI Deposit to GH of $70,000 USD.

44.     On August 31, 2021, TFIC management committee approved proposal for TFIC to join POMS based upon invitation from and representations made by WMO.

45.     TFIC began the process of identifying and contacting potential investors and banks.

46.     On September 2, 2021, while the second payment of $70,000 was due to GH, WMO was unable to transfer the payments to POMS.

47.     On September 2, 2021, WMO and Landry agreed that Landry would capitalize POMS with his own money and submit to GH the LOI payment.

48.     WMO was to reimburse Landry for that payment.

49.     On September 7, 2021, TFIC delivered its financial statements and corporate overview along with information related to POMS's corporate structure, directional indication of the financing process to be followed, and an initial financial model prepared by TFIC to WMO and Landry. This financing process and model became the basis for all the work toward financing of POMS.

50.     WMO never indicated any opposition to the financial arrangements or structure and never suggested any alterative structure.

51.    POMS was in negotiations with GE to construct and charter two CTVs which would also serve on the Vineyard Wind project.

52.    On September 17, 2021, Liberty Green/Liberty Maritime ("Liberty") introduced itself to Landry and WMO as a potential investor in POMS' three CTV opportunities.

53.    Liberty represented that it had substantial capital available for immediate use to fund the construction of the CTVs.

54.    In response to Liberty's offer, Zohner stated that WMO did not want to partner with Liberty.

55.    On October 8, 2021, Zohner stated to TFIC that WMO wanted to move forward with TFIC as part of POMS.

56.    At the same time, Zohner also disclosed to TFIC that it had been in discussion with Liberty during the period after TFIC had received its internal approvals and had provided confidential documentation to WMO in the belief that a partnership was imminent.

57.    TFIC informed Zohner that they were surprised to learn WMO had been in discussions with a competing party, but that they agreed to proceed on an exclusive basis with Landry and WMO.

58.    Zohner stated to Landry and TFIC that due to a WMO re-capitalization process, it was unable to provide their 49% of capital for until December 2021.

59.    At this same time, Zohner stated to Landry and TFIC that several US vessel owning and operating firms, including but not limited to FOSS and Tidewater, were interested in investing in WMO.

60.    Landry and TFIC expressed concern to Zohner that if another US based company was investing in WMO, a change in control or ownership in WMO could have a negative or conflicting interest with WMO's ownership in POMS.

61.    As a result, a clause was inserted into the parties Interim Operating Agreement to specifically address this issue.

62.    Zohner represented that WMO would provide $500,000 initially, and the remainder after their re-capitalization process was completed.

63.    TFIC's role expanded to source effectively all capital for PO1.

64.    On October 14, 2021, Zohner stated to Landry that he was buying the shares of old investors of WMO.

65.    Zohner informed Landry that after they bought the shares of the "old investors" of WMO, they planned to sell approximately 33% of WMO to a third-party.

66.    On October 14, 2021, TFIC was introduced to GE as an additional shareholder and an equity partner of POMS by WMO.

67.    TFIC provided two versions of financing presentations that outlined their approach to funding, including non-recourse bank debt and third-party equity investors for use in meeting with GE.

68.    WMO explained to GE that TFIC and WMO would split the responsibility of the PCGs ratably between TFIC and WMO.

69.    GE approved the revised structure, and two Charter Parties were signed.

70.    On October 15, 2021, Landry, TFIC, and WMO signed an MOU, with all three parties as owning members of POMS.

71.    TFIC, WMO and Landry executed a Memorandum of Understanding "MOU" memorializing WMO's $500,000 initial capitalization, and the remainder after their re-capitalization process was completed.

72.    After the signing of the MOU, TFIC and Landry worked to raise necessary equity capital and bank financing in the form of the General Partner (GP) and LP structure. The agreed-upon provisions included:

    a.   The ongoing process and discussions with several banks, including M&T Bank, Citizens Bank, BMO Harris, South Shore Bank, Bay Coast Bank, Regions Bank, Deutsche Bank, Canadian Imperial Bank Commerce, Mass. Development, Key Bank, and TD Bank;

    b.   The ongoing process and discussions with LP equity investors, including Amber Infrastructure (who provided a support letter for POMS's purposes with GE) and Pacific Life (Ghost Tree) who provided an indication of interest, Liberty Maritime, Crowley Maritime, and John Hastings Group;

    c.   The basis for the financing package was that the GPs were WMO, TFIC, and Landry;

    d.   TFIC and WMO would provide the PCGs to the clients thereby limiting the liability to the LPs.

73.    On October 19, 2021, TFIC drafted POMS operating agreements and submitted them for review.

74.    On October 21, 2021, due to WMO's delinquent funding, GH LOI was extended again for the third payment of $100,000.

75.     On October 21, 2021, TFIC submitted their financial statements to GE for credit review and submitted POMS operating agreement(s) to WMO and Landry for execution to satisfy GE's requirements.

76.     On or about October  27, 2021, TFIC and WMO executed the PCG.

77.     Subsequent correspondence took place between GE, WMO, POMS, and TFIC. This included Zohner explaining the finance and wherewithal behind WMO and POMS, stating that WMO had all the necessary capital to fund the project.  Zohner provided a spreadsheet to GE indicating wherewithal behind WMO and stated in an email to GE:

> I can confirm that the required equity is available from the shareholders behind the operating companies WMO (WMO Shipping company/Exes Invest + a new shareholder as informed to GE 14 days ago) and TFIC.  The Board of Directors in both companies have confirmed this to the banks we are discussing with at the moment and is the fundamentals from our side to be able to execute the contracts with GE.

78.     On October 27, 2021, Zohner stated in an email to GE:

> "Hi Pierre, Following our call this morning please see attached updated overview of ultimate shareholders in WMO and total equity of 107 mill EUR is available, which is based on 2020 accounts. The Board of Directors in WMO who represents the ultimate shareholders have confirmed that their is sufficient captain available to fund the project with GE and also other projects we have been awarded.  Further as highlighted in previous meetings wmo is in final negotiations for selling part of shares and include a new shareholder for strengthening the company for further growth. We can not release the name yet but it's an international company that have a market cap at 850 mill EUR. Closing is expected in December where we can release more info on the new shareholder.

79.     TFIC provided the final form of financing offering document and the financing model for dissemination to lenders and investors, requesting feedback to specific inquiries, and in particular any objections to the presentation and model.

80.    TFIC established an online due diligence database to be accessed by lenders and investors and provided access to Landry and WMO.  WMO never bothered to access the data site.

81.    On October 29, 2021, GH LOI was extended again with the third payment of $100,000. The Parties agreed to fund this payment as follows:

    a.   WMO: $47,500

    b.   TFIC: $37,500

    c.   Landry: $15,000

82.    On October 29, 2021, Zohner informed Landry that Foss Maritime had interest in acquiring shares of WMO.

83.    Zohner stated to Landry that this would have no impact on POMS or POMS's capital-raising process.

84.    On November 1, 2021, the LOI extension with GH expired.

85.    On November 3, 2021, Zohner informed TFIC and Landry for the first time that WMO has engaged Clarksons Shipping Company ("Clarksons") and initiated a formal process for new shareholding and capital raising.

86.    When TFIC inquired if this could be a majority, controlling shareholder, WMO indicated that it was possible.

87.    When TFIC inquired if this could be a US shareholder or investor, with obvious Jones Act implications, Zohner stated that it was possible.

88.    TFIC pointed out to Zohner that the process being conducted by WMO was possibly in conflict with the POMS process and that the parties should be careful not to confuse or cannibalize the market and participants.

89.    On November 3, 2021, Zohner forwarded the final investor presentation, indicating to
       TFIC that this effort had been in process for some time.

90.    On November 4, 2021, an Interim Operating Agreements (IOA) were drafted based on
       the following information:

    a.    Under § 7.2 of the IOA, TFIC and Landry noted that if WMO sells an interest
          resulting in a change of control within WMO, then WMO and the new
          shareholder are obligated to provide formal notice to POMS of that change of
          control and that the new controlling shareholder must reaffirm the non-compete
          and exclusivity language within § 7.1 of the IOA;

    b.    If the new shareholder does not reaffirm the non-compete provisions, then the
          conduct of doing so would constate a breach of contract under the agreement and
          Landry and TFIC could seek appropriate damages;

    c.    § 7.2 was added to the IOA as Landry and TFIC were concerned that a sale of
          WMO interest to a U.S. entity would have a negative impact on POMS;

    d.    In response to this concern, WMO stated that there would be no impact to POMS,
          and that they would comply with the clause.

91.    On November 6, 2021, TFIC led a video conference with Landry and Claus Carlsen of
       WMO to revise the financial base case and business case models based on the ongoing
       negotiations with GE and provided updates on the financing process.

92.    On November 9, 2021, IOAs for POMS, POH1 and POH2 were signed between the
       parties as structured in the MOU.

93.    On November 12, 2021, a conference call was held between Liberty Maritime, WMO
       (including Zohner), Landry and TFIC to discuss investments by Liberty into POMS as

one possible capital source.  Liberty stated they were prepared to make substantial investments into POMS subject to reaching an agreement on the shareholding structure of POMS.

94.    Zohner subsequently objected to forming a partnership with Liberty.

95.    POMS corporate structure was formed in this manner to achieve the desired aggregate ownership percentage of Landry, TFIC, and WMO, in compliance with the Jones Act.

96.    POMS received an indication of interest letter from Amber infrastructure (a long-term funding partner of TFIC) indicating, among other things, their interest and ability to fund 100% of project capital requirements.

97.    On November 24, 2021, POMS entered in two identical Charter Party agreements with GE Renewable Energy US ("GE Agreement").  The Charter Parties were signed by Landry as the CEO of POMS and Zohner on behalf of WMO.

98.    The GE Agreement was to provide two-27-meter Inertia M3 CTVs that were to be constructed at a U.S. shipyard and delivered on June 1, 2023, in support of GE's Scope of Work on the VW1 offshore wind farm.

99.    Prior to signing the GE Charter Parties, WMO represented to GE and POMS that it had the necessary capital to deliver on the project and would assume the role of providing the PCGs.

100.    The form of PCG was agreed as a function of signing the Charter Parties.

101.    POMS was to deliver WMO's PCG within 30-days from the date that the Charter Parties went into effect.

102.    On December 8, 2021, POMS was informed of a management change within WMO. Schneider was replacing Zohner as CEO.

103. On December 13, 2021, TFIC, Landry, and WMO conducted a virtual meeting where TFIC provided a detailed overview of the status of financing, including the status with banks and LP investors as well as an update on the process and timing including the potential requirement for 'bridge' or interim funding, which had been previously highlighted to WMO.

104. TFIC provided detail regarding identities, status, and process with all bank and equity investors. Schneider was reminded of the offer letter received from Amber Infrastructure, dated November 9, 2021.

105. On December 13, 2021, during an In-person meeting in New Bedford, Massachusetts with GE (Schneider attended by teleconference):

    a.  Schneider was introduced to GE as the new CEO of WMO; and

    b.  Schneider confirmed to GE, WMO's commitment to the project, stating it was "business as usual" and "WMO was fully committed to the project"

106. On or about December 17, 2021 Schneider stated that WMO was unable to provide any of the previously agreed-upon PCGs.

107. In response, Landry and TFIC informed Schneider that WMO had already agreed to the PCGs in their current form as a function of the executed Charter Parties.

108. In response, Schneider stated:

    a.  Zohner did not have board mandate to enter into these agreements;

    b.  WMO was representing that the shareholders of WMO were not aware that Zohner on behalf of WMO executed the operating agreements of POMS, POH1 and POH2; and

    c.   The WMO would not support or provide any corporate guarantees towards interim bridge funding in support of the funding of the new build vessels.

109.   Clearly either Zohner was lying or WMO and Schneider were lying as the WMO Board of Directors were involved and knew about Landry working on this project in the WMO office.

110.   On December 17, 2021, the parties agreed that in order to meet WMO's "new mandate," POMS would approach U.S. vessel-owning and operating companies to participate in POMS ownership interest as a GP, as well as provide an investment as an LP.

111.   TFIC prepared an amended offering document and model, and POMS began an approach to multiple U.S. owners and operators including Guice Offshore, Crowley Maritime, and Hornblower. The amended offering document and model included the following:

    a.   The amended project finance strategy, that accommodated WMO's retraction from funding commitments; and

    b.   The amended strategy provision of the PCGs, that accommodated WMOs retraction from providing their commitments in providing this to GE and VW1.

112.   Multiple meetings were held over the course of the following weeks with Guice Offshore, Crowley Maritime, Hornblower, and Amber Infrastructure.

113.   Later in December, Zohner informed Landry that he was having conversations with Foss regarding an equity investment in WMO and POMS and suggested that Landry attended a meeting with him and Foss to discuss further.

114.   Landry stated to Zohner that there would be a conflict of interest, as Zohner was relieved of his position at WMO, and that Landry would not engage in any conversation with any investor without the inclusion of the remainder of the POMS partners.

115.   Landry stated to Zohner that his discussion with Foss compromised the capital-raising process that the POMS partners had undertaken.

116.   Zohner had a vested interest in bringing Foss into POMS as Foss previously provided a letter of interest to WMO regarding an acquisition of interest and capital raise of WMO.

117.   Zohner had previously shared a WMO investor offering with Landry that the POMS U.S. projects and contracts with VW1 and GE brough significant value to WMO shares.

118.   During one phone call, Zohner again pressed Landry to enter a discussion with Foss.

119.   In response to Zohner's request, Landry stated that if a meeting was going to take place with Foss, then Landry would first seek the approval from Schneider as the new CEO of WMO and TFIC.  Further, Landry insisted Schneider and TFIC be present in any such discussion.  Zohner agreed to Landry's request.

120.   Landry informed Schneider and Kristensen that Foss desired to enter into a discussion regarding POMS and the contracts in the U.S.

121.   Landry informed Schneider and Kristensen that Zohner had initiated the conversations with Foss without knowledge or approval of Landry or TFIC.

122.   After discussions between Landry, Schneider, Kristensen, and TFIC, there was a mutual agreement to meet with Foss to determine their level of interest as a partner to POMS.

123.   Thereafter, Landry contacted Paul Gallagher ("Gallaher") at Foss and arranged for a meeting to discuss the investment opportunity in POMS, however no details were shared with Gallagher about POMS partners or the VW1 or GE contracts.

124.   On December 22, 2021, prior to the scheduled meeting, Gallagher reached out to Landry to have a "pre-meeting" with himself and Peter Pietka ("Pietka") of Saltchuck, parent company to Foss.

125.   During this "pre-meeting," Gallagher and Pietka inquired with Landry as to Zohner's status within WMO. They were confused as they had both been in conversation with Zohner regarding the VW1 and GE contracts but realized that Zohner was removed from his role as CEO but remained a shareholder of WMO.

126.   Gallagher and Pietka also inquired as to the purpose of the formal meeting with the group, as they were not aware of who would be participating.

127.   A meeting took place with the following participants Pietka, Gallagher, Landry, TFIC, Schneider and Kristensen.

128.   POMS presented to Foss on the investment and partnership opportunity with POMS. The context of the presentation was that POMS was awarded contracts with VW1 and GE and were seeking a capital investment partner to fund the construction of the newbuilt vessels and to provide additional operational resources to POMS. An overview of the financial model was presented.

129.   Upon conclusion of the meeting, Gallagher and Pietka expressed interest in the opportunity and mentioned that the opportunity would be discussed internally.

130.   At the end of December, following the meeting with Foss, Landry followed up several times with Gallagher requesting a follow-up conversation to receive feedback. Gallagher was not responsive to these requests, and a follow-up meeting did not take place.

131.   Thereafter, TFIC, Landry, and Schneider mutually agreed that Foss was not a viable option due to their lack of feedback and engagement, as well as the conflict of Zohner discussing a deal in the background without Landry, TFIC, or Schneider present.

132.   Landry, TFIC and WMO agreed to not dedicate any additional time towards a partnership with Foss or share any of the contract details.

133.    On December 31, 2021, POMS signed a Letter of Intent to construct 2x CTVs with the shipyard, Metal Shark Boats, in support of the GE contracts.  TFIC, WMO, and Landry all agreed to enter into this agreement.  Schneider executed the Letter of Intent.

134.    On January 2, 2022, Gallagher informed Landry that Pietka had scheduled a meeting with Zohner in Denmark, and that Schneider met with Pietka.  Landry and TFIC were not invited to participate in those meetings.

135.    On January 6, 2022, TFIC and Landry informed Schneider and Kristensen that Guice Offshore indicated in principle agreement to TFIC's structure and that Amber Infra had restated their willingness to fund 100% of the needed capital (debt and equity). This new structure captured all of WMO's stated concerns regarding the shareholding structure of POMS, capital contributions, and corporate guarantees.

136.    On January 7, 2022, Schneider informed Landry and TFIC that he had called for emergency board meeting to address the current state of affairs with POMS within WMO in order to seek advice on how to proceed.

137.    At this same time, Schneider informed GE in a Team's meeting that he needed to seek the advice of the WMO board on how to proceed.

138.    GE stated that if WMO abandons the project, they would be very concerned from an operational and project execution perspective and that the POMS setup relied upon WMO's participation.

139.    Upon information and belief, Zohner voted against any involvement with Amber Infra and Guice Offshore demonstrating that Zohner was still in control of WMO affairs.

140.    Through January 7-11, 2022, TFIC and Landry continued to work with Guice Offshore, Crowley, M&T Bank, Amber and other lenders, to arrange a structure and committed financing in accord with the plans and process agreed among the POMS members.

141.    Through January 7-11, TFIC and Landry kept WMO, through Schneider and others, apprised of progress toward a structure and financing agreement.  No response was forthcoming from WMO or Schneider, and WMO representatives refused to participate in the meetings and calls in the effort to finalize a financing structure.

142.    Schneider provided no guidance and no indication that this process should be suspended.

143.    On January 9, 2022, TFIC and Landry sent the Demand and Notice Letter to WMO requiring WMO to provide TFIC and Landry to affirm obligations to POMS.  If they failed to do so by 0700 US EST on January 12, 2022, TFIC and Landry would take steps to mitigate damages to POMS and the clients.

144.    On January 12, 2022, TFIC and Landry informed WMO of a letter agreement signed by Guice Offshore, Landry, TFIC, and Amber, and requested WMO's signature.  The letter affirmed agreement towards the finance structure of POMS between the parties.

145.    WMO refused to sign the agreement, despite its conformity with all WMOs demands.

146.    On January 12, 2022, at 6:57am Schneider stated in an email to TFIC and Landry that he believes the proposals for financing that were presented were far away from what has been the foundation of any agreements between the parties and that the setup was too complicated.  Schneider also stated that WMO received a Notice of Interest from Foss and insisted that POMS considers the offer. Schneider also stated that he was contacted by Peter Pietka late at night and that they were still interested and would send a letter shortly. Schneider stated that WMO and POMS should still jointly investigate other

options, referring to Foss.  Schneider requested a phone call with TFIC and Landry prior to the scheduled GE update meeting.

147.   TFIC and Landry made themselves available for a meeting, but Schneider failed to participate.   Instead, Schneider provided an email stating that he has informed GE of WMO's position, minutes ahead of the GE update meeting.  TFIC and Landry were not invited to that meeting.

148.   The meeting commenced with GE, Landry and TFIC.  WMO did not inform TFIC and Landry that WMO was not attending but found out only from GE at the beginning of the meeting. GE stated that Schneider informed GE that WMO would not be participating in the scheduled group update meeting.

149.   Also during this time, Schneider forwarded an email from Foss wherein Foss referenced a conceptual joint venture partnership between WMO and Foss, none of which addressed the context of the initial presentation given to Foss on December 22, 2021, where TFIC, Landry, and WMO presented an investment opportunity in POMS.  It was abundantly clear that WMO was going into partnership with Foss without Landry or TFIC.

150.   On January 13, 2022, notice was received from Schneider of WMO resigning from POMS.

151.   Schneider unilaterally informed GE and VW that WMO was resigning from POMS and that all communications should be directed to Landry.

152.   Landry and TFIC rejected WMO's resignation.

153.   On January 14, 2022, GE sent an email to Landry and TFIC stating that GE would like to speak openly with WMO about their resignation from POMS and requesting that POMS release WMO from their obligations.

154.   On January 17, 2022, TFIC and Landry released WMO from the POMS non-disclosure agreements under certain conditions, so that GE could speak openly with WMO as to why they have abandoned POMS and the project.

155.   On January 25, 2022, Schneider replied that he does not seek the release from non-disclosure agreements.

156.   GE stated they were unable to conclude as to what happened within WMO and POMS and they would not move forward until a conclusion was reached.

157.   As a result of WMO's actions, GE canceled its contract for two CTVs.

158.   As a result of WMO's actions, POMS had to liquidate the VW1 contract for one CTV.

159.   Upon information and belief, WMO withdrew from POMS to specifically pursue opportunities with Foss and other US Maritime companies in direct opposition of the MOU and Interim Operating Agreements.

160.   As a result of WMO's actions that resulted in the cancellation of the VW1 and GE contracts, Landry and TFIC has sustained a financial loss in excess over $18,237,700 US Dollars for:

   a.   Losses from direct out of pocket expenses;

   b.   Lost time, cost of services and internal costs;

   c.   Loss of development fee opportunity;

   d.   Loss of GE and VW1 contract revenues;

   e.   Loss of revenues upon rehire by GE and VW1;

   f.   Loss of additional business opportunities due to WMO's abandonment and dissolution of the joint venture;

   g.   Future salaries and affiliate revenues; and

h.   Other damages that will be demonstrated at trial.

## COUNT I
## Breach Of The Implied Covenant Of Good Faith And Fair Dealing

161.   Plaintiffs restate and realleges paragraphs 1 through 160 as if fully set forth herein.

162.   Inherent in the Parties' Agreements is a covenant of good faith and fair dealing.

163.   The implied covenant provides that neither party shall do anything that will have the
effect of destroying or injuring the right of the other party to receive the fruits of the
contract.

164.   Put another way, the parties to a contract implicitly agree to deal honesty and in good
faith in both the performance and the enforcement of their contract.

165.   Through the conduct described above, the Defendants breached the implied covenant of
good faith and fair dealing owed to the Plaintiffs and POMS.

166.   Defendants breached of the implied covenant of good faith and fair dealing Plaintiffs
suffered damages as will be demonstrated at trial.

## COUNT II
## Breach of Fiduciary Duty

167.   Plaintiffs restate and realleges paragraphs 1 through 166 as if fully set forth herein.

168.   Plaintiffs through Defendants' inducement, entered into the MOU and the Interim
Operating Agreements based upon Zohner's representations that WMO, and therefor
WMO LLC, had the financial ability and desire to form and participate in POMS and that
he had authority to act on behalf of WMO.

169.   Zohner's actions and statements as then CEO of WMO instilled trust and confidence in
Landry and TFIC to enter into the MOU and POMS with WMO.  After all, WMO holds
itself out as a leader in the CTV and Wind Farm areas.

170.   By virtue of their relationship, the Defendants owed fiduciary obligations to the Plaintiffs and POMS.

171.   Defendants breached their fiduciary duties causing the Plaintiffs substantial damages as will be demonstrated at trial.

## COUNT III
## Breach Of The MOU And Interim Operating Agreements

172.   Plaintiffs restate and realleges paragraphs 1 through 171 as if fully set forth herein.

173.   Defendants had a contractual obligation to not compete with Plaintiffs.

174.   Defendants and others, as will be demonstrated at trial, directly competed with POMS by entering into direct negotiations with Foss to the exclusion of POMS and the Plaintiffs.

175.   Defendants and others, as will be demonstrated at trial, actions are a clear breach of the MOU's and the Interim Operating Agreements' clear non-compete language.

176.   As a result of Defendants' breach of the Agreements, the Plaintiffs have sustained damages.

## COUNT IV
## Fraudulent Inducement

177.   Plaintiffs restate and realleges paragraphs 1 through 176 as if fully set forth herein.

178.   The duty to refrain from using fraud to obtain a contract is separate and distinct from the duty to perform a contract already entered into.

179.   A fraud in the inducement claim relates to fraudulent representations made prior to the inception of the contract and made for the purpose of inducing the claimant to agree to the contract in the first place.

180.   Defendants made misleading statements to Plaintiffs as set forth herein.

181.   Defendants made those statements to induce Plaintiffs to enter into the MOU and Operating Agreements of POMS, POH1 and POH2.

182.   These statements, as later stated by Defendants, were false and misleading because Defendants never intended to be involved with POMS, but rather other US maritime companies.

183.   Defendants was using its relationship with Plaintiffs to gain an advantage with Foss and others as will be demonstrated at trial.

184.   Plaintiffs' reliance on Defendants' statements and representations was reasonable and justifiable under the circumstances and were also detrimental to the Plaintiffs as they entered into an agreement with WMO and WMO LLC when they could have entered into agreements with others resulting in the same financial result.

185.   As a result, Defendants should be required to pay Plaintiffs money damages in an amount to be proven at trial sufficient to compensate Plaintiffs for their losses.

## COUNT V – ALL DEFENDANTS
## Tortious Interference With Contractual Relations

186.   Plaintiffs restate and realleges paragraphs 1 through 185 as if fully set forth herein.

187.   Defendants were aware of the contracts POMS had with GE and VW1 and therefore owed a duty to Plaintiffs.

188.   Defendants intentionally and maliciously interfered with those contracts for the purpose of harming POMS for the benefit of WMO of which Zohner, at all relevant times, was a either a 50% or 49% shareholder of WMO.

189.   As a direct and proximate result of Defendants' tortious interference, Plaintiffs have been damaged as will be demonstrated at trial.

## COUNT VI – ALL DEFENDANTS
## FRAUD

190.    Plaintiffs restate and realleges paragraphs 1 through 189 as if fully set forth herein.

191.    The Defendants made false representations or omitted material information in violation of their express duty to disclose, namely Zohner's authority.

192.    The Defendants did so for the purpose of inducing the Plaintiffs to engage in pursuing the contracts that were awarded as the Defendants could not so on their own.

193.    Either Zohner had authority to act on behalf of WMO or he did not.

194.    At all relevant times, the Defendants lied to the Plaintiffs.

195.    The Plaintiffs undertook actions to secure contracts and financing at a cost to them.

196.    As a result of the Defendants' actions Plaintiffs suffered damages as will be demonstrated at trial.

## COUNT VII – ALL DEFENDANTS
## NEGLIGENT MISREPRESENTATION

197.    Plaintiffs restate and realleges paragraphs 1 through 197 as if fully set forth herein.

198.    During the Parties relationship, the Defendants supplied false information to the Plaintiffs to guide them in their business transaction and are subject to liability for the pecuniary loss caused to the Plaintiffs by their justifiable reliance upon the information as the Defendants failed to exercise reasonable care or competence in obtaining or communicating the information.

199.    The Plaintiffs who suffered economic injury are entitled to recover against the Defendants who committed the tort of negligent misrepresentation in an amount that will be demonstrated at trial.

WHEREFORE, Plaintiffs Michael Landry and Treadwell Franklin Infrastructure Capital LLC pray that this Honorable Court:

    a.      Enter Judgment in Plaintiffs favor on all counts;

    b.      Award damages to Plaintiffs on account of their actual losses;

    c.      Award Plaintiffs attorneys' fees and costs and such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs, Michael Landry and  Treadwell Franklin Infrastructure Capital LLC demands a trial by jury on all claims.

Respectfully submitted
Plaintiffs'
By their attorney,

/s/ David S. Smith
David S. Smith, Esq.
BBO No.: 634865
Farrell Smith O'Connell
Aarsheim Aprans, LLP
27 Congress St., Suite 109
Salem, Massachusetts 01970
Tel: 978-744-8918
Fax: 978-666-0383
dsmith@fsofirm.com

Dated:  September 7, 2022