**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **MICHAEL LANDRY, TREADWELL FRANKLIN INFRASTRUCTURE CAPITAL, LLC, and PATRIOT OFFSHORE MARINE SERVICES, LLC,** Plaintiffs, <br><br> v. <br><br> **WORLD MARINE OFFSHORE A/S, WORLD MARINE OFFSHORE LLC, LARS CHRISTIAN ZOHNER, and JIMMY KRISTENSEN,** Defendants. | Civil Action No.: 1:22-cv-11432-AK |

<u>**PLAINTIFFS' AMENDED COMPLAINT**</u>

David S. Smith (BBO No.: 634865)
Olaf Aprans (BBO No.: 670434)
**Farrell Smith O'Connell**
**Aarsheim Aprans, LLP**
27 Congress Street, Suite 109
Salem, Massachusetts 01970

## TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………………...4

PARTIES……………………………………………………………………………………….5

JURISDICTION AND VENUE………………………………………………………………..6

THE JONES ACT………………………………………………………………………………7

FACTUAL BACKGROUND…………………………………………………………………..7

      PARTY HISTORY……………………………………………………………………..7

      JV IS FORMED.  SECURES VW OFFSHORE TENDER CHARTER…………………8

      TFIC CONSIDERS POMS……………………………………………………………11

      POMS EXECUTES GE LOI FOR 2 CTV CHARTERS………………………………..12

      POMS SECURES VW INCAT CHARTER……………………………………………12

      POMS PERFORMS AND PURSUES OPPORTUNITIES……………………………..13

      TFIC TO JOIN POMS. LANDRY COVERS WMO……………………………………13

      LIBERTY INTERESTED.  WMO OBJECTS…………………………………………..14

      JV DRAFTS OPERATING AGREEMENT/MOU……………………………………..15

      PARTIES EXECUTE MOU……………………………………………………………17

      DEFENDANTS MARKET POMS……………………………………………………...17

      WMO EXTENDS PAYMENT AND AGREES TO CONTRIBUTE…………………..19

      WMO SEEKS ADDITIONAL PARTNERS……………………………………………19

      POMS OPERATING AGREEMENT DRAFTED/EXECUTED………………………..20

      LIBERTY RENEWS INTEREST.  WMO RENEWS OBJECTION……………………22

      POMS SECURES TWO [2] GE CTV CHARTERS……………………………………23

      WMO BOARD CHANGES.  SCHNEIDER REPLACES ZOHNER…………………..24

WMO RENEGES…………………………………………………………………………25

POMS ACCOMMODATES WMO TO MITIGATE LOSS……………………………26

ZOHNER PROMOTES FOSS PARTNERSHIP…………………………………… 27

POMS STARTS PERFORMING GE CHARTERS……………………………………29

WMO UNILATERALLY NEGOTIATES WITH FOSS………………………………30

POMS ACCOMMODATES WMO.  WMO RENEGES AGAIN………………………30

WMO PARTNERS WITH FOSS, CUTTING OUT POMS……………………………32

COUNT I: Breach of Contract Obligations……………………………………………...35

FAILURE OF WMO AND WMO LLC TO WORK EXCLUSIVELY…………………36

WMO AND WMO LLC VIOLATED NON-COMPETE………………………………36

WMO FAILED TO FULFILL ITS OBLIGATIONS……………………………………37

WMO'S WRONGFUL WITHDRAWAL FROM POMS………………………………37

COUNT II: Breach of the Implied Covenant of Good Faith and Fair Dealing…………………38

FROM THE BEGINNING WMO DID NOT ACT IN GOOD FAITH…………………38

WMO CONTINUED TO ACT WRONGFULLY DURING THE
THE COURSE OF PERFORMANCE…………………………………………………… 39

COUNT III: Breach of Fiduciary Duty…………………………………………………39

POMS WAS A CLOSELY HELD COMPANY…………………………………………...39

COUNT IV: Fraudulent Inducement……………………………………………………41

COUNT V:  Tortious Interference with Contractual Relations…………………………42

COUNT VI: Fraud………………………………………………………………………43

COUNT VII:  Negligent Misrepresentation……………………………………………44

PRAYER FOR RELIEF…………………………………………………………………44

JURY DEMAND…………………………………………………………………………45

Plaintiffs, Michael Landry ("Landry") and Treadwell Franklin Infrastructure Capital LLC ("TFIC"), and Patriot Offshore Marine Services, LLC ("POMS") (collectively "Plaintiffs") bring this action against World Marine Offshore A/S ("WMO"), World Marine Offshore LLC ("WMO LLC"), Lars Christian Zohner ("Zohner"), and Jimmy Kristensen ("Kristensen").  Plaintiffs allege as follows:

## INTRODUCTION

1.      Offshore wind development in the United States is critical both to obtaining the current Administration's goal of a 50-52% reduction in greenhouse gas pollution by 2030, and for building America's clean energy economy.  Critical to the creation of high paying, American jobs in the U.S. offshore wind industry, is an existing Cabotage statute, the Jones Act, which limits foreign control and ownership in the United States Merchant fleet engaged in coastwise trade, and which also requires all coastwise vessels to be built in the United States.

2.      Because of the Jones Act, European firms experienced in offshore wind must partner with Americans to invest in this new, but growing, industry.  It is important that such partnership arrangements be honored, because the construction of windfarm support vessels requires significant capital costs and long term commitment.  The industry will not come to fruition and the economic and environmental goals of offshore wind development cannot be realized if the obligations of such partnerships are not honored.

3.      This dispute involves such a foreign-U.S. partnership arrangements for offshore wind development.  Plaintiffs and Defendants formed a joint venture entity, POMS, to build and operate wind farm support vessels.  This action seeks to recover the more than 18 million dollars in investment, costs, and expenses paid, lost profits and other injuries arising from Defendants' willful bad faith, intentional misconduct, violations and breaches of POMS's Operating

Agreement and Memorandum of Understanding ("MOU") and unilateral actions that scuttled several contracts/charter parties with Vineyard Wind, General Electric and the development of further business opportunities, all as described _infra_ (collectively, the "Projects").

4.      Stated simply, the litigation results from the intentional bad acts of Zohner and Kristensen acting in conjunction with and through WMO.  Together the Danish Defendants formed POMS with the American Plaintiffs and secured the several Projects.  When it came time to perform those Projects, however, Defendants reneged on their commitments, strung Plaintiffs along demanding further accommodations, and then abandoned the joint venture when more lucrative and unilateral opportunities arose.  This caused wrongful termination of the Projects, and significant damage to Plaintiffs, while wrongfully benefiting Defendants.

## PARTIES

5.      Landry is an individual who resides in Marshfield, Massachusetts.

6.      TFIC is a Delaware Corporation with a principal place of business located at 14-16 York Street, Portland, Maine.  It is comprised of two members that reside in Maine.[1]

7.      POMS is a limited liability company organized under Massachusetts law with a principal place of business within the District.

8.      WMO is a Denmark corporation with a principal place of business located at Torkesaj 1 DK-6700, Esberg, Denmark.

9.      At all relevant times, 50% ownership of WMO was held by Exes Invest which was equally owned by Lars Zohner, Peter Lykke Kjeldsen, John Mejer, Jogvan Ullmann, Jimmy

---

[1] At the filing of the Complaint, TFIC's principal office was located at 40 Forest Falls Drive, Suite 2, Yarmouth, Maine 04096 and was comprised of three members that reside in Maine. TFIC has since moved and the remaining two members bought out the third member who has retired.

T. Kristensen and Jesper Mortensen.  Exes Invest were the founders and management of WMO.

The remaining 50% was held by a Danish investment group called WMO Shipping A/S.

      10.    WMO LLC is Delaware limited liability company and wholly owned subsidiary

of WMO.

      11.    Zohner is a resident of Denmark and is a shareholder in WMO. Zohner was CEO

of WMO from its inception.  As set forth below, he was later removed from that position but

remained a shareholder.

      12.    Kristensen is a resident of Denmark and is a shareholder in WMO.  Kristensen

was always the COO for WMO from its inception.  At the time Zohner was removed as CEO,

Kristensen became a member of WMO's Board of Directors.

      13.    Non-Party Hans Schneider ("Schneider") is a resident of Denmark and the current

CEO of WMO.

## JURISDICTION AND VENUE

      14.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§1332 because the Plaintiffs and Defendants are citizens of different states and the amount in

controversy exceeds $75,000.

      15.    This Court has personal jurisdiction over each of the Defendants by virtue of the

Massachusetts long arm statute, Mass. Gen. L. c. 223A, §3 and the United States Constitution.

The conduct of each of the Defendants articulated herein caused and continues to cause damage

to the Plaintiffs, all which occurred within the Commonwealth of Massachusetts.  WMO and

WMO LLC executed contracts submitting themselves to Massachusetts jurisdiction.   Zohner

and Kristensen, who are employees, founders and/or shareholders of WMO and WMO LLC,

physically came to Massachusetts to conduct business for WMO and their own financial benefit.

Further, WMO acted through Zohner and Kristensen.  The joint venture formed by the parties herein was to service offshore windfarms off the Massachusetts coast with homeports of New Bedford and Vineyard Haven, Massachusetts.

16.     Venue is proper in this District because all the events that give rise to this action occurred within this District and all parties agreed to this District being the proper venue.

## THE JONES ACT

17.     The Jones Act generally prohibits a maritime vessel from providing any part of the transportation of merchandise by water—or by land and water—between points in the United States, either directly or via a foreign port, unless the vessel is "coastwise-qualified," i.e., U.S.-built, U.S.-registered, and U.S.-owned. 46 U.S.C. § 55102(b) (formerly 46 U.S.C. app. § 883).  '

18.     The Jones Act requires that all waterborne shipping points between points within the U.S. be carried by vessels built in the U.S, owned by U.S. Citizens (at least 75%), and manned with U.S. citizens crews.  The Act essentially bars foreign built and operated vessels from engaging in U.S. domestic commerce.

19.     The Jones Act was enacted to encourage and aid in the development of a vibrant U.S. maritime industry.  46 USC § 50101.

## FACTUAL BACKGROUND

**PARTY HISTORY**

20.     In October of 2016, Landry established Patriot Offshore, Inc. ("POI") to build and operate wind farm support vessels.

21.     After graduating a maritime academy college and prior to forming POI, Landry worked for Transocean as deck officer, Dynamic Position Operator and part of a new-build commission and delivery team for ten years.

22.     At all relevant times, and as stated on its website and Investor Presentation, WMO is a global provider of offshore logistic support, service and solutions to the offshore wind markets.  WMO held itself out as a leading player in the offshore wind services segment with more than 10 years of operations.

23.     At all relevant times, and as stated on its website and Investor Presentation, WMO is a Danish shipping company that was established in 2012 to meet the increasing demand for cost effective, safe and efficient solutions in offshore crew and cargo transfers.

24.     At all relevant times, and as stated on its website and Investor Presentation, WMO held itself out as providing a wide range of services for the offshore wind market, from offshore crew transfer, offshore support, offshore standby services to ferry services and more.

25.     At all relevant times, and as stated on its website and Investor Presentation, WMO has a versatile fleet specialized in effectively transferring crew and cargo to and from offshore wind turbines.

26.     At all relevant times, and as stated on its website and Investor Presentation, WMO states that it provides high performance with its variety of Crew Transfer Vessels ("CTV") in its fleet.

27.     At all relevant times, and as stated on its website and Investor Presentation, WMO had 12 vessels operating around the globe with four more to be built, not including the three vessels that are the subject of this action that were also to be built.

**JV IS FORMED. SECURES VW OFFSHORE TENDER CHARTER.**

28.     It is no secret that wind farms are happening off of the Massachusetts coast.

29.     Beginning on September 15, 2017, initial communications began between Landry, Kristensen and Zohner about their mutual desires to enter the U.S. wind farm market beginning with Massachusetts.

30.     As a foreign company owned by non-United States citizens, WMO cannot single-handedly engage in the wind farm work happening off of Massachusetts or anywhere else in the United States due to the Cabotage laws of the Jones Act.

31.     As much as Landry desired to enter the wind farm market, he could not do it without the experience and financial backing of a company like WMO.

32.     Landry worked with Zohner, Kristensen and others from WMO to form a joint venture (the "JV") that was Jones Act compliant whereby :

a.      WMO was a financing resource;

b.      WMO provided financials to all clients with proposals;

c.      WMO provided the management expertise, Certification, Safety Management Systems, Vessel Management Systems, including International Organization for Standardization ("ISO") Certifications which were requisites to operating wind farm support vessels from Massachusetts.

33.     While working with Zohner in WMO's offices, Landry was introduced to some of WMO Board of Directors.

34.     Regular meetings were held by Zohner, Kristensen, other WMO employees and Landry.  Kristensen was the note taker at these meetings that resulted in Minutes of Meetings that were later circulated among everyone involved.

35.     On August 30, 2020, WMO and POI signed a Joint Venture Consortium Declaration upon submission of an original bid to Vineyard Wind, LLC ("VW") for Offshore

Logistics Tender, which bound WMO and POI to the official bid to VW.  The submission was executed by Landry and Zohner, and pledged that they will form a JV entity.

36.     In December of 2020, the law firm of Winston & Strawn, LLP was retained to assist in structuring Jones Act compliant entities.  Their services were paid jointly by WMO and Landry.

37.     Zohner began working to promote the JV with other entities to develop synergies for the US East Coast Market.  Zohner's promotions made clear to market participants that WMO was a 49% co-owner of POMS.

38.     On March 8, 2021, Patriot Offshore Marine Services, LLC ("POMS"), Patriot Offshore Holding 1, LLC ("POH1") and Patriot Offshore Holding 2, LLC ("POH2") filed Certificates of Organization with the Commonwealth of Massachusetts.

39.     The Landry and WMO's joint venture was structured, as was then negotiated with Zohner and Kristensen, to accommodate WMO's desire to be a 49% owner in the aggregate of POMS and Landry to own 51%.

40.     On May 10, 2021, a best and final offer was submitted by POMS to VW for the Offshore Logistics Tender.  Said offer was executed by Landry and Zohner, and advised the JV entity, POMS, was formed.

41.     On July 2, 2021, WMO added POMS to its ISO 9000 Certification which was necessary to obtain a contract with VW.

42.     On July 2, 2021, POMS was awarded the Offshore Logistics Tender Contract from VW.

**TFIC CONSIDERS POMS**

43.     On or about July 15, 2021, George Campbell, partner of TFIC, met with Zohner, and Jimmy Kristensen, in Denmark to discuss the essence of a future partnership in POMS.

44.     Later in July of 2021, Landry and Zohner engaged with TFIC as a potential partner in POMS.

45.     On August 6, 2021, Zohner made a presentation to Stephen Jones ("Jones") and TFIC explaining:

a.     The Vessels will hail from New Bedford, Massachusetts and Vineyard Haven, Massachusetts; and

b.     That this is a growing business that TFIC was being invited into with substantial projected annual profits.[2] .

46.     TFIC was an integrated servicer and developer of infrastructure assets and critical services including development, financing, technical and asset management offerings.

47.     TFIC had no experience in any offshore industry and relied heavily on WMO's, Zohner's and Kristensen's experience and representations.

48.     During the discussions with Jones who is a Member of TFIC, Zohner represented that his and WMO's experience was that CTV contracts were "sticky," meaning once a company is awarded a contract, the contract is automatically renewed unless there is a catastrophic failure to perform because of the significant capital expended by a company in building the vessel for this new wind energy business.

_____

[2] The specific amount is withheld at this time for confidentiality purposes.

49.     TFIC was to lead the project financing and assisting in raising capital, in addition to WMO's capital and capital raising efforts, through TFIC's funding partners, who would be included in POMS as Limited Partners ("LP").

50.     At that time, TFIC would not formally initialize the capital raising process until an agreement or a memorandum of understanding was executed amongst Landry, TFIC and WMO and a formal commitment was made to include TFIC in POMS.

**POMS EXECUTES GE LOI FOR 2 CTV CHARTERS.**

51.     On August 10, 2021, POMS signed a Letter of Intent with General Electric ("GE") for the provision of two CTV's.  The Letter of Intent stipulated that GE and POMS intended to enter into a Charter Party agreement once GE received a Notice to Proceed from VW.

52.     The Letter of Intent stated that POMS would begin the vessel engineering and design work as part of the construction process for the vessels, ahead of signing the final Charter Party agreement.

53.     Landry and Zohner both signed the Letter of Intent and POMS engaged with the vessel designer and shipyards to complete engineering and design work.

**POMS SECURES VW INCAT CTV CHARTER.**

54.     On August 12, 2021, POMS entered into a Charter Party agreement with Vineyard Wind 1, LLC ("VW1") to have a 27-meter Incat Crowther CTV constructed at Gladding Hearn Shipyard ("GH") with a delivery date of June 1, 2023 in order to support the construction and Operation and Maintenance phase of the VW1 offshore wind farm.  That Charter Party Agreement was executed by Landry and Zohner.

55.     The Charter Party with VW1 stipulated that WMO would assume the role of providing the Parent Company Guarantees ("PCG").

56.     POMS was given 60-days from the date of execution of the Charter Party, to provide a signed PCG from WMO.

57.     On August 12, 2021, POMS entered into a Letter of Intent (LOI) with GH to construct the Incat CTV that was signed by both Landry and Zohner.

**POMS PERFORMS AND PURSUES OPPORTUNITIES.**

58.     On August 13, 2021, WMO formed WMO LLC.

59.     On August 16, 2021, Kristensen arrived in the US to conduct client meetings, shipyard visits, and partnership meetings with TFIC much of which occurred in Massachusetts.

60.     Landry and Kristensen traveled around the U.S. together to conduct client development and other meetings.

57.     On August 18, 2021, WMO wire transferred $70,000 USD to POMS and POMS, in turn, made the Initial LOI Deposit to GH of $70,000 USD.

**TFIC TO JOIN POMS.  LANDRY COVERS WMO.**

58.     As of August 25, 2021, Zohner was hurrying Landry and Winston & Strawn to set up articles for the company and hold off on agreements until a third party could join in the structure that would allow WMO to maintain 49% ownership in the aggregate.

59.     On August 31, 2021, TFIC management committee approved a proposal for TFIC to join POMS based upon representations made by Zohner, Kristensen and WMO about the profitability and success of this industry.  After all, TFIC was relying upon Zohner, Kristensen and WMO's experience in the wind farm arena as this was a totally new industry for TFIC.

60.     TFIC began the process of identifying and contacting potential investors and banks.

61.     On September 2, 2021, while the second payment of $70,000 was due to GH, WMO was unable to transfer the payments to POMS.

62.     On September 2, 2021, WMO, Zohner, Kristensen and Landry agreed that Landry would capitalize POMS with his own money and submit to GH the LOI payment.

63.     WMO through Zohner's representation was to reimburse Landry for that payment.

64.     On September 7, 2021, TFIC delivered its financial statements and corporate overview along with information related to POMS's corporate structure, directional indication of the financing process to be followed, and an initial financial model prepared by TFIC to WMO, Zohner, Kristensen and Landry.

65.     WMO, Zohner and Kristensen never indicated any opposition to the financial arrangements or structure and never suggested any alterative structure.

66.     POMS was in negotiations with GE to construct and charter two CTVs which would also serve on the Vineyard Wind project.  Those negotiations included Landry, Zohner, Kristensen and Jones.

**LIBERTY INTERESTED. WMO OBJECTS.**

67.     On September 17, 2021, Liberty Green/Liberty Maritime ("Liberty") introduced itself to Landry and Zohner as a potential investor in POMS' three CTV opportunities.

68.     Liberty represented that it had substantial capital available for immediate use to fund the construction of the CTVs.

69.     Shortly after the September 17th meeting with Liberty, Zohner stated that WMO did not want to partner with Liberty.

**JV DRAFTS OPERATING AGREEMENTS/MOU.**

70.     On October 6, 2021, Landry sent to Zohner the following documents drafted by Winston & Strawn, LLP:

  a.  Organizational Consent of Patriot Offshore Holding 2, LLC
  b.  Organizational Consent of Patriot Offshore Holding 1, LLC
  c.  Organizational Consent of Patriot Offshore Marine Services LLC
  d.  LLC Agreement of Patriot Offshore Holding 2, LLC
  e.  LLC Agreement of Patriot Offshore Holding 1, LLC
  f.  LLC Agreement of Patriot Offshore Marine Services LLC
  g.  And a structure chart with abbreviated LLC names.

71.     WMO paid its pro rata share of Winston & Strawn's invoice for the drafting of these Jones Act complaint documents.

72.     On October 8, 2021, Zohner stated to Jones that WMO wanted to move forward with TFIC as part of POMS.

73.     At the same time, Zohner also disclosed to Jones that Zohner had been in discussion with Liberty during the period after TFIC had provided confidential documentation to WMO in the belief that a partnership was imminent.

74.     Jones informed Zohner that TFIC was surprised to learn WMO had been in discussions with a competing party, but that TFIC agreed to proceed on an exclusive basis with Landry and WMO.

75.     On October 8, 2021, Zohner stated to Landry and Jones that due to a WMO re-capitalization process, it was unable to provide their 49% of capital for until December 2021.

76. Additionally, Zohner stated to Landry and Jones that several US vessel owning and operating firms, including but not limited to FOSS and Tidewater, were interested in investing in WMO.

77. On October 8, 2021, Landry and Jones expressed concern to Zohner that if another US based company was investing in WMO, a change in control or ownership in WMO could have a negative or conflicting interest with WMO's ownership in POMS.

78. As a result, a clause was inserted into the parties Interim Operating Agreement to specifically address this issue.

79. On October 8, 2021, Zohner represented that WMO would provide $500,000 initially, and the remainder after their re-capitalization process was completed.

80. Between October 9 to 11, 2021, Zohner and Jones both drafted an MOU.

81. On October 11, 2021, Zohner stated in an e-mail to Landry, Jones and Kristensen: "[a]s I said I would need BOD approval when we [have] agreed however I have of [course] kept our BOD in loop on this process."

82. On October 14, 2021, Zohner stated to Landry that he was buying the shares of old investors of WMO.

83. Zohner informed Landry that after they bought the shares of the "old investors" of WMO, they planned to sell approximately 33% of WMO to a third-party.

84. On October 14, 2021, TFIC was introduced to GE as an additional shareholder and an equity partner of POMS by WMO.

85. Jones, in the presence of Zohner of WMO and Landry, provided two versions of financing presentations that outlined POMS approach to funding, including non-recourse

bank debt and third-party equity investors for use in meeting with GE. Zohner used those financing presentations for a presentation to GE in the presence of Jones and Landry.

**PARTIES EXECUTE MOU.**

86. On October 15, 2021, Landry, Jones, and Zohner signed an MOU that was drafted by TFIC and WMO, with all three parties as owning members of POMS.

87. Jones on behalf of TFIC, Zohner on behalf of WMO and Landry executed a Memorandum of Understanding "MOU" memorializing WMO's $500,000 initial capitalization, and the remainder after their re-capitalization process was completed.

88. After the signing of the MOU, TFIC and Landry worked to raise necessary equity capital and bank financing in the form of the General Partner (GP) and LP structure.

89. On October 21, 2021, due to WMO's delinquent funding, GH LOI was extended again for the third payment of $100,000.

90. On October 21, 2021, TFIC submitted their financial statements to GE for credit review and submitted POMS operating agreement(s) to WMO and Landry for execution to satisfy GE's requirements.

91. On October 22, 2022, Zohner was ordered by WMO's Board of Directors to withdraw from all US ventures, including any involving with Landry or TFIC. Plaintiffs learned about this after they filed the complaint in this action.

92. On or about October 27, 2021, The parties agreed to the terms of the PCG.

**DEFENDANTS MARKET POMS.**

93. In October 2021, Zohner explained to GE the finance and wherewithal behind WMO and POMS, stating that WMO had all the necessary capital to fund the project. Zohner provided a financial spreadsheet to GE and stated in an email to GE:

> "I can confirm that the required equity is available from the shareholders behind the operating companies WMO (WMO Shipping company/Exes Invest + a new shareholder as informed to GE 14 days ago) and TFIC.  The Board of Directors in both companies have confirmed this to the banks we are discussing with at the moment and is the fundamentals from our side to be able to execute the contracts with GE."

94.     On October 27, 2021, Zohner stated in an email to GE:

> "Hi Pierre, Following our call this morning please see attached updated overview of ultimate shareholders in WMO and total equity of 107 mill EUR is available, which is based on 2020 accounts. The Board of Directors in WMO who represents the ultimate shareholders have confirmed that their is sufficient captain [sic.] available to fund the project with GE and also other projects we have been awarded.  Further as highlighted in previous meetings wmo is in final negotiations for selling part of shares and include a new shareholder for strengthening the company for further growth. We can not release the name yet but it's an international company that have a market cap at 850 mill EUR. Closing is expected in December where we can release more info on the new shareholder."

95.     Landry and TFIC did not know the identity of the unnamed shareholder referenced in Zohner's e-mail.

96.     On October 28, 2021, Zohner and Kristensen of WMO finalized and began to circulate its Investor Presentation, which was circulated to Plaintiffs and potential investors.

97.     The Investor Presentation sought investors to take out owners of WMO Shipping A/S and repay a shareholder loan.

98.     The Investor Presentation represented that WMO had joint ventures in France, Asia and the US.

99.     The Investor Presentation sought to raise equity to fund current new build programs of many vessels which included three for  POMS.

100.    The Investor Presentation stated that WMO had "secured long-term contracts for all newbuilds with leading counterparts in US."

101.    The Investor Presentation stated that in 2021, a Joint Venture was created called POMS and that it Awarded 2 long term CTV contracts for work in the US for GE.

102.    The Investor Presentation stated that POMS was actively owned by WMO and operated by the board consisting of Stephen Jones (CEO, TFIC), Michael Landry (Chair, Patriot) and Lars C. Zohner (CEO, WMO).  Other key persons include Jimmy T. Kristensen (COO, WMO).

103.    The Investor Presentation stated that this POMS was among the first European CTV players to land contracts in the US offshore wind market.

**WMO EXTENDS PAYMENT AND AGREES TO CONTRIBUTE.**

104.    On October 29, 2021, GH LOI was extended again with the third payment of $100,000. The Parties agreed to fund this payment as follows:

    a.   WMO: $47,500

    b.   TFIC: $37,500

    c.   Landry: $15,000

**WMO SEEKS ADDITIONAL PARTNERS.**

105.    On October 29, 2021, Zohner informed Landry that Foss Maritime had interest in acquiring shares of WMO.

106.    Zohner stated to Landry that this would have no impact on POMS or POMS's capital-raising process.

107.    On November 1, 2021, the LOI extension with GH expired.

108.    On November 3, 2021, Zohner informed Jones and Landry for the first time that WMO
        has engaged Clarksons Shipping Company ("Clarksons") and initiated a formal process
        for new shareholding and capital raising.

109.    When Jones inquired if this could be a majority, controlling shareholder, Zohner
        indicated that it was possible.

110.    When Jones inquired if this could be a US shareholder or investor, with obvious Jones
        Act implications, Zohner stated that it was possible.

111.    Jones pointed out to Zohner that the process being conducted by WMO was possibly in
        conflict with the POMS process and that the parties should be careful not to confuse or
        cannibalize the market and participants.

112.    On November 3, 2021, Zohner forwarded the Investor Presentation, indicating to Jones
        that this effort had been in process for some time.

**POMS OPERATING AGREEMENTS DRAFTED/EXECUTED.**

113.    On November 4, 2021, an Interim Operating Agreements (IOA) were drafted based on
        the following information:

        a.    Under § 7.2 of the IOA, TFIC and Landry noted that if WMO sells an interest
              resulting in a change of control within WMO, then WMO and the new
              shareholder are obligated to provide formal notice to POMS of that change of
              control and that the new controlling shareholder must reaffirm the non-compete
              and exclusivity language within § 7.1 of the IOA;

        b.    If the new shareholder does not reaffirm the non-compete provisions, then the
              conduct of doing so would constate a breach of contract under the agreement and
              Landry and TFIC could seek appropriate damages;

    c.  § 7.2 was added to the IOA as Landry and TFIC were concerned that a sale of WMO interest to a U.S. entity would have a negative impact on POMS;

    d.  In response to this concern, Zohner and Kristensen stated that there would be no impact to POMS, and that they would comply with the clause.

114.    There were back and forth edits of the IOA by and between Jones and Zohner.

115.    Pressure was mounting to get something in place, as GE wanted POMS to be established and to have operating agreements so that the Charter Party Agreements would not reflect an inaccuracy.

116.    On November 6, 2021, Jones led a video conference with Landry and Claus Carlsen of WMO to revise the financial base case and business case models based on the ongoing negotiations with GE and provided updates on the financing process.  Mr. Carlsen also provided Landry and Jones with WMO's operational financial models for the GE contracts.  WMO's financial models were intimately necessary for TFIC to perform its financial and business models.  Mr. Carlsen is the CFO of WMO.

117.    On November 9, 2021, IOAs for POMS, Patriot Holdings LLC 1 ("PH1") and Patriot Holdings LLC 2 ("PH2") were signed between the parties as structured in the MOU.

118.    Appendix A to the POMS IOA was a draft Operating Agreement for POMS which only needed administrative changes as noted by Kristensen.

119.    Appendix A to PH1 was a draft operating agreement for POH1 which was the actual names of the LLC but had been abbreviated for purposes of presentations and inadvertently adopted in the IOA.

120.    Appendix A to PH2 was a draft operating agreement for POH2 which was the actual names of the LLC but had been abbreviated for purposes of presentations and inadvertently adopted in the IOA.

121.   Appendix B to each IOA was the MOU that was to be referenced for commercial terms, but only paragraphs 1, 13 and 14 of the MOU were incorporated into the IOAs.

122.   Zohner signed each IOA on behalf of WMO.  Zohner was the designated person to act for POMS.

123.   Kristensen was the designated substitute for Zohner for POMS.

124.   Each agreement related back to the filing of a Certificate of Organization with the March 8, 2021 with the Commonwealth of Massachusetts.

125.   POMS was comprised of three members, Landry, WMO and TFIC.

126.   There was no ready market for the Landry, WMO and TFIC's membership interest in POMS.  All members to POMS participated in the management and direction of POMS, including Zohner and Kristensen.  POMS was truly unique and operating in a very new market.

**LIBERTY RENEWS INTEREST.  WMO RENEWS OBJECTION.**

127.   On November 12, 2021, a conference call was held between Liberty Maritime, Zohner, Landry and Jones to discuss investments by Liberty into POMS as one possible capital source.  Liberty stated they were prepared to make substantial investments into POMS subject to reaching an agreement on the shareholding structure of POMS.

128.   Zohner subsequently objected to forming a partnership with Liberty.

## POMS SECURES TWO [2] GE CTV CHARTERS

129.   On November 9, 2021, POMS received an indication of interest letter from Amber

infrastructure (a long-term funding partner of TFIC) indicating, among other things, their

interest and ability to fund 100% of project capital requirements.  The letter included

significant mark ups and comments to the GE contracts.  All was forwarded to Zohner

and Kristensen on November 11, 2021.

130.   Zohner explained to GE that TFIC and WMO would split the responsibility of the PCGs

ratably between TFIC and WMO.

131.   GE approved the revised structure.

132.   On November 24, 2021, a Teams meeting was held with Kristensen and Landry.  Absent

from that meeting was Helle Els, Zohner, Claus Carlsen and Stephen Jones.  Kristensen

was the note taker of the meeting that generated Minutes of the Meeting ("MOM").  The

MOM states:

> LEGAL REGISTRATION
> Registration Winston and Strong [aka Strawn] are updating the operating
> agreement still some administrative work.
> **TASK:** Michael; get a statement that the company has been registered;
> Michaels own company is Patriot Offshore Services LLC
> WMO-TFIC and POS to sign a new operating agreement.

133.   On November 24, 2021, POMS entered in two identical Charter Party agreements with

GE Renewable Energy US ("GE Agreement").  The Charter Parties were signed by the

three members of POMS - Landry as the CEO of POMS, Stephen Jones on behalf of

TFIC and Zohner on behalf of WMO.

134.   The two GE Agreements each contained Clause 56 concerning Owners' Shareholding,

Parent Company Guarantees and allocation of responsibilities.  That paragraph made it

clear that WMO was a 47.5% owner of POMS.

135.    The GE Agreement was to provide two-27-meter Inertia M3 CTVs that were to be constructed at a U.S. shipyard and delivered on June 1, 2023, in support of GE's Scope of Work on the VW1 offshore wind farm.

136.    Prior to signing the GE Charter Parties, Zohner represented to GE and POMS that it had the necessary capital to deliver on the project and would assume the role of providing the PCGs.

137.    The form of PCG was agreed as a function of signing the Charter Parties.

138.    POMS was to deliver WMO's PCG within 30-days from the date that the Charter Parties went into effect.

**WMO BOARD CHANGES.  SCHNEIDER REPLACES ZOHNER.**

139.    WMO claims that sometime in November of 2021, all three Board of Directors of WMO were removed.  Five new board members were installed, including Kristensen.  Plaintiffs did not learn of this event until after filing this action.

140.    On December 8, 2021, POMS was informed of a management change within WMO. Schneider was replacing Zohner as CEO.  The effect of the removal of Zohner by WMO made it unclear to the Plaintiffs as to whether Schneider, Kristensen, or Zohner was the individual to act on behalf of WMO for POMS.  However, Schneider assured Landry and Jones that he was filling in for Zohner in POMS.

141.    On December 13, 2021, Jones, Landry, and Schneider and Claus Carlsen of WMO conducted a virtual meeting where Jones provided a detailed overview of the status of financing, including the status with banks and LP investors as well as an update on the process and timing including the potential requirement for 'bridge' or interim funding, which had been previously highlighted to WMO.

142. Jones provided detail regarding identities, status, and process with all bank and equity investors. Schneider was reminded of the offer letter received from Amber Infrastructure, dated November 9, 2021.

143. On December 13, 2021, during an In-person meeting in New Bedford, Massachusetts with GE (Schneider attended by zoom):

    a. Schneider was introduced to GE as the new CEO of WMO; and

    b. Schneider confirmed to GE, WMO's commitment to the project, stating it was "business as usual" and "WMO was fully committed to the project."

**WMO RENEGES.**

144. On or about December 17, 2021 Schneider stated to Landry and Jones that WMO was unable to provide any of the previously agreed-upon PCGs.

145. As of December 17, 2021, the Plaintiffs had already spent more than $237,375.00 of their own funds investing in POMS to get and perform the three contracts.

146. On the same day, Landry and TFIC informed Schneider that WMO had already agreed to the PCGs in their current form as a function of the executed Charter Parties.

147. On the same day, Schneider stated:

    a. Zohner did not have board mandate to enter into these agreements;

    b. WMO was representing that the shareholders of WMO were not aware that Zohner on behalf of WMO executed the operating agreements of POMS, PH1 and PH2; and

    c. The WMO would not support or provide any corporate guarantees towards interim bridge funding in support of the funding of the new build vessels.

148. Clearly either Zohner and Kristensen were lying or acting independently from WMO or WMO and Schneider were lying and acting independently from Exes Invest as:

    a.  the WMO Board of Directors were involved and knew about Landry working on this project in the WMO office;

    b.  Zohner and Kristensen held themselves out as owning 50% of the company through Exes Invest and both were fully involved with the negotiations of the VW1 and GE contracts that contained the PCG;

    c.  WMO's Investor Presentation dated October 28, 2021 highlighted the VW1 and GE contracts, that WMO was part of a Jones Act compliant JV with POMS and identified all of the then WMO Board of Directors; and

    d.  After Schneider replaced Zohner, Kristensen was made a Board of Director. Clearly, Kristensen was aware of Zohner's actions, the executed contracts and IOA as well as PCGs.

149. At this point in time, the Plaintiffs were out of $ 237,253.36.

**POMS ACCOMMODATES WMO TO MITIGATE LOSS.**

150. On December 17, 2021, and in an attempt to mitigate Plaintiffs' damages on account of WMO's breach, the parties proceeded (without prejudice) to meet WMO's "new mandate," and POMS approached U.S. vessel-owning and operating companies to participate in POMS ownership interest as a general partner ("GP"), as well as provide an investment as a limited partner ("LP").

151. TFIC prepared an amended offering document and model, and POMS began an approach to multiple U.S. owners and operators including Guice Offshore, Crowley Maritime, and Hornblower. The amended offering document and model included the following:

    a.   The amended project finance strategy, that accommodated WMO's wrongful retraction from funding commitments; and

    b.   The amended strategy provision of the PCGs, that accommodated WMOs wrongful retraction from providing their commitments in providing this to GE and VW1.

152.    Multiple meetings were held over the course of the following weeks with Guice Offshore, Crowley Maritime, Hornblower, and Amber Infrastructure.

## ZOHNER PROMOTES FOSS PARTNERSHIP

153.    Later in December and while outside of his role as CEO of WMO, Zohner informed Landry that he was having conversations with Foss regarding an equity investment in WMO and POMS and suggested that Landry attended a meeting with him and Foss to discuss further.

154.    Landry stated to Zohner that there would be a conflict of interest, as Zohner was relieved of his position at WMO, and that Landry would not engage in any conversation with any investor without the inclusion of the remainder of the POMS partners.

155.    Landry stated to Zohner that his discussion with Foss compromised the capital-raising process that the POMS partners had undertaken.

156.    Zohner had a vested interest in bringing Foss into POMS as Foss previously provided a letter of interest to WMO regarding an acquisition of interest and capital raise of WMO.

157.    Zohner had previously shared a WMO investor offering with Landry that the POMS U.S. projects and contracts with VW1 and GE brought significant value to WMO shares.

158.    During one phone call, Zohner again pressed Landry to enter a discussion with Foss.

159.    In response to Zohner's request, Landry stated that if a meeting was going to take place with Foss, then Landry would first seek the approval from Schneider as the new CEO of WMO and TFIC.  Further, Landry insisted Schneider and TFIC be present in any such discussion.  Zohner agreed to Landry's request.

160.    Landry informed Schneider and Kristensen that Foss desired to enter into a discussion regarding POMS and the contracts in the U.S.

161.    Landry informed Schneider and Kristensen that Zohner had initiated the conversations with Foss without knowledge or approval of Landry or TFIC.

162.    After discussions between Landry, Schneider, Kristensen, and TFIC, there was a mutual agreement to meet with Foss to determine their level of interest as a partner to POMS.

163.    Thereafter, Landry contacted Paul Gallagher ("Gallaher") at Foss and arranged for a meeting to discuss the investment opportunity in POMS, however no details were shared with Gallagher about POMS partners or the VW1 or GE contracts.

164.    On December 22, 2021, prior to the scheduled meeting, Gallagher reached out to Landry to have a "pre-meeting" with himself and Peter Pietka ("Pietka") of Saltchuck, parent company to Foss.

165.    During this "pre-meeting," Gallagher and Pietka inquired with Landry as to Zohner's status within WMO. They were confused as they had both been in conversation with Zohner regarding the VW1 and GE contracts but realized that Zohner was removed from his role as CEO but remained a shareholder of WMO.

166.    Gallagher and Pietka also inquired as to the purpose of the formal meeting with the group, as they were not aware of who would be participating.

167.    On December 22, 2021, a meeting took place with the following participants Pietka, Gallagher, Landry, TFIC, Schneider and Kristensen.

168.    POMS presented to Foss on the investment and partnership opportunity with POMS. The context of the presentation was that POMS was awarded contracts with VW1 and GE and were seeking a capital investment partner to fund the construction of the newbuilt vessels and to provide additional operational resources to POMS. An overview of the financial model was presented.

169.    Upon conclusion of the meeting, Gallagher and Pietka expressed interest in the opportunity and mentioned that the opportunity would be discussed internally.

170.    At the end of December, following the meeting with Foss, Landry followed up several times with Gallagher requesting a follow-up conversation to receive feedback. Gallagher was not responsive to these requests, and a follow-up meeting did not take place that included Landry, Jones or TFIC.

171.    Thereafter, TFIC, Landry, and Schneider mutually agreed that Foss was not a viable option due to their lack of feedback and engagement, as well as the conflict of Zohner discussing a deal in the background without Landry, TFIC, or Schneider present.

172.    On December 27, 2021, Kristensen confirmed that Foss was out of the picture.

173.    Landry, TFIC and WMO agreed to not dedicate any additional time towards a partnership with Foss or share any of the contract details.

**POMS STARTS PERFORMING GE CHARTERS.**

174.    On December 31, 2021, POMS signed a Letter of Intent to construct 2x CTVs with the shipyard, Metal Shark Boats, in support of the GE contracts.  TFIC, WMO, and Landry

all agreed to enter into this agreement.  The Letter of Intent was signed by Landry after approval by Schneider and Kristensen.

## WMO UNILATERALLY NEGOTIATES WITH FOSS.

175.  On January 2, 2022, Gallagher informed Landry that Pietka had scheduled a meeting with Zohner in Denmark, and that Schneider met with Pietka.  Landry and TFIC were not invited to participate in those meetings and were not aware that Schneider met with Pietka.

## POMS ACCOMODATES WMO.  WMO RENEGES AGAIN.

176.  On January 6, 2022, TFIC and Landry informed Schneider and Kristensen that Guice Offshore indicated in principle agreement to TFIC's structure and that Amber Infra had restated their willingness to fund 100% of the needed capital (debt and equity). This new structure captured all of WMO's stated concerns regarding the shareholding structure of POMS, capital contributions, and corporate guarantees.  In the past WMO promoted Amber Infa as a funding source to GE.

177.  On January 7, 2022, Schneider informed Landry and TFIC that he had called for emergency board meeting to address the current state of affairs with POMS within WMO in order to seek advice on how to proceed.

178.  On January 7, 2022, Schneider informed GE's personnel in a Team's meeting that he needed to seek the advice of the WMO board on how to proceed.  GE personnel specifically asked Schneider what his recommendation would be to the WMO board. Schneider declined to answer.  GE personnel expressed dismay and surprise by Schneider's response.

179. GE stated that if WMO abandons the project, they would be very concerned from an operational and project execution perspective and that the POMS setup relied upon WMO's participation.

180. Upon information and belief, Zohner voted against any involvement with Amber Infra and Guice Offshore demonstrating that Zohner was still in control of WMO affairs.

181. Through January 7-11, 2022, TFIC and Landry continued to work with Guice Offshore, Crowley, M&T Bank, Amber and other lenders, to arrange a structure and committed financing in accord with the plans and process agreed among the POMS members.

182. Through January 7-11, TFIC and Landry kept WMO, through Schneider and others, apprised of progress toward a structure and financing agreement.  No response was forthcoming from WMO or Schneider, and WMO representatives refused to participate in the meetings and calls in the effort to finalize a financing structure.

183. Schneider provided no guidance and no indication that this process should be suspended.

184. On January 9, 2022, TFIC and Landry sent the Demand and Notice Letter to WMO requiring WMO to provide TFIC and Landry to affirm obligations to POMS.  If they failed to do so by 0700 US EST on January 12, 2022, TFIC and Landry would take steps to mitigate damages to POMS and the clients.

185. On January 12, 2022, TFIC and Landry informed WMO of a letter agreement signed by Guice Offshore, Landry, TFIC, and Amber, and requested WMO's signature.  The letter affirmed agreement towards the finance structure of POMS between the parties.

186. WMO refused to sign the agreement, despite its conformity with all WMOs demands.

187. On January 12, 2022, at 6:57am Schneider stated in an email to TFIC and Landry that he believes the proposals for financing that were presented were far away from what has

been the foundation of any agreements between the parties and that the setup was too complicated.  Schneider also stated that WMO received a Notice of Interest from Foss and insisted that POMS considers the offer. Schneider also stated that he was contacted by Peter Pietka late at night and that they were still interested and would send a letter shortly. Schneider stated that WMO and POMS should still jointly investigate other options, referring to Foss.  Schneider requested a phone call with TFIC and Landry prior to the scheduled GE update meeting.

## WMO PARTNERS WITH FOSS, CUTTING OUT POMS

188.  On this same day, Landry and TFIC learned that Schneider had an ongoing dialog with Gallagher of Foss and Pietka of Salchuk Marine without Landry or TFIC for several weeks.  As a result of that dialogue and Schnieder's request, Saltchuck Marine proposed to enter into an agreement with WMO for CTV contracts on the US East Coast with Saltchuck's two CTV contracts and POMS' three CTV contracts.  That proposal cutting TFIC and Landry completely out of the contracts that POMS had obtained.

189.  TFIC and Landry made themselves available for a meeting, but Schneider failed to participate.   Instead, Schneider provided an email stating that he has informed GE of WMO's position, minutes ahead of the GE update meeting.  TFIC and Landry were not invited to that meeting.

190.  The meeting commenced with GE, Landry and TFIC.  WMO did not inform TFIC and Landry that WMO was not attending but found out only from GE at the beginning of the meeting. GE stated that Schneider informed GE that WMO would not be participating in the scheduled group update meeting.

191.   It was abundantly clear to the Plaintiffs that WMO was going into partnership with Foss without Landry or TFIC.

192.   Zohner and Kristensen clearly stood to personally benefit financially through any deal with Foss or Slatchuck Marine.

193.   Zohner's discussions with Foss after he was removed as CEO of WMO were not with authority of WMO or POMS.

194.   Zohner knew of the non-compete exclusivity and non-compete language contained in the IOAs.

195.   Kristensen knew of Zohner's change in position as he was the COO and then exalted to the Board of Directors of WMO.

196.   Kristensen knew of the non-compete exclusivity and non-compete language contained in the IOAs.

197.   Schenider knew of non-compete exclusivity and non-compete language contained in the IOAs.

198.   Zohner, Kristensen and Schenider were all primary participants on behalf of themselves and on behalf of WMO.

199.   On January 13, 2022, notice was received from Schneider of WMO resigning from POMS.  This resignation did not comply with Massachusetts law or the IOA.

200.   WMO did not give Landry or TFIC an opportunity to replace WMO with another experienced vessel operator.

201.   Schneider unilaterally informed GE and VW that WMO was resigning from POMS and that all communications should be directed to Landry.

202.   Landry and TFIC rejected WMO's resignation.

203. On January 14, 2022, GE sent an email to Landry and TFIC stating that GE would like to speak openly with WMO about their resignation from POMS and requesting that POMS release WMO from their obligations.

204. On January 17, 2022, TFIC and Landry released WMO from the POMS non-disclosure agreements under certain conditions, so that GE could speak openly with WMO as to why they have abandoned POMS and the project.

205. On January 25, 2022, Schneider replied that he does not seek the release from non-disclosure agreements.

206. GE stated they were unable to conclude as to what happened within WMO and POMS and they would not move forward until a conclusion was reached.

207. As a result of WMO's actions, GE canceled its contract for two CTVs.

208. As a result of WMO's actions, POMS had to liquidate the VW1 contract for one CTV as the contract contained a liquidated damages provision for non-performance.

209. Upon information and belief, WMO withdrew from POMS to specifically pursue opportunities with Foss and other US Maritime companies in direct opposition of the MOU and Interim Operating Agreements.

210. As a result of WMO's actions that resulted in the cancellation of the VW1 and GE contracts, Landry and TFIC has sustained a financial loss in excess over $18,237,700.00 US Dollars for:

    a. Losses from direct out of pocket expenses;

    b. Lost time, cost of services and internal costs;

    c. Loss of development fee opportunity;

    d. Loss of GE and VW1 contract revenues;

e.  Loss of revenues upon rehire by GE and VW1;

f.  Loss of additional business opportunities due to WMO's abandonment and dissolution of the joint venture;

g.  Future salaries and affiliate revenues; and

h.  Other damages that will be demonstrated at trial.

**COUNT I**
**Breach Of Contract Obligations – WMO and WMO LLC**

211.  Plaintiffs restate and realleges paragraphs 1 through 210 as if fully set forth herein.

212.  By engaging in the conduct alleged in this Amended Complaint, WMO and WMO LLC breached numerous provisions of the POMS IOA.

213.  The IOA is a valid, binding, enforceable agreement made for valid consideration that was drafted and agreed to by the Parties.

214.  Plaintiffs performed all their obligations as provided in the IOA.

215.  The effective date of the IOA related back to March 8, 2021.

216.  The effective date relation back was done to consummate the relationship of the parties to the VW Offshore Logistics Tender Contract.

217.  The Operating Agreement that was Appendix A to the IOA was the one drafted by Winston & Strawn LLP that was circulated on October 6, 2021 that simply needed administrative work as noted by Kristensen.

218.  The MOU was Appendix B to the IOA.  As stated at Article 4.2 of the IOA, the MOU was only to be referred to "for commercial matters and other terms and conditions."

219.  As stated in Article 5.3 of the IOA, the Parties were responsible for managing and administering day-to-day operations and business of POMS, including executing

agreements and contracts, including but limited to loan documents by which debts and obligations of POMS were created, incurred, or evidenced.

220. As stated in Article 7.1 of the IOA, the only provisions of the MOU that were specifically incorporated in the IOA were Paragraph 1 describing the business of POMS, Paragraph 13 Exclusivity and Paragraph 14 Non-Compete making them specifically binding on WMO.

221. As described above, WMO breached the IOA, including the provisions identified and/or incorporated herein.

### FAILURE OF WMO AND WMO LLC TO WORK EXCLUSIVELY

222. WMO and WMO LLC failed to work exclusively with the Plaintiffs by engaging with third parties, such as to undertake roles and activities that were intended for POMS and the Plaintiffs.

223. As stated above, WMO through Zohner communicated without the Plaintiffs to Liberty, Foss/Saltchuk Marine and unknown third parties.

224. As stated above, WMO through Schnieder communicated without the Plaintiffs to Foss/Saltchuk Marine and unknown third parties.

225. As a result of WMO's efforts, it received a proposal to fulfil commitments of the VW1 and GE contracts with Foss/Saltchuk Marine whereby WMO and Foss/Saltchuk Marine to the complete exclusion of TFIC and a significant reduction in ownership and control for Landry.

### WMO AND WMO LLC VIOLATED NON-COMPETE

226. WMO and WMO LLC failed to comply with the non-compete provisions in the IOA by actively engaging in developing business in the Territory in which POMS was to operate.

227. As discussed above, WMO through both Zohner and Schneider communicated with third parties in attempts to develop business in the US wind farm market, including Massachusetts where POMS was to operate.

228. Those discussions had by WMO with third parties actually resulted in an offer from Foss/Saltchuk Marine whereby WMO and Foss/Saltchuk Marine to the complete exclusion of TFIC and a significant reduction in ownership and control for Landry.

### WMO FAILED TO FULFILL ITS OBLIGATIONS

229. WMO and WMO LLC failed to fulfill its duties as a member of POMS.

230. Article 5.1 required WMO "to do or cause to be done any and all acts or things deemed by the Members to be necessary, appropriate, or desirable to carry out or further the business of" POMS.

231. WMO failed to execute the PCGs that were promised and agreed to by the Parties as part of the VW1 and GE contracts.

232. WMO failed to execute the POMS Operating Agreement within 30 days after execution of the IOA that was only lacking administrative edits.

### WMO'S WRONGFUL WITHDRAWAL FROM POMS

233. WMO withdrawal from POMS was in violation of the IOA.

234. The IOA incorporated the Massachusetts Limited Liability Act ("Act").

235. The IOA did not have an express term concerning the resignation from POMS and as such the Act controls.

236. Massachusetts General Laws Chapter 156C §36 states that a Member must provide not less than six months prior written notice to POMS.

237. WMO and WMO LLC provided no notice to withdrawing from POMS.

238.   As a result of WMO's and WMO LLC's breach of the IOA, the Plaintiffs have sustained damages.

## COUNT II
## Breach Of The Implied Covenant
## Of Good Faith And Fair Dealing – WMO and WMO LLC

239.   Plaintiffs restate and realleges paragraphs 1 through 238 as if fully set forth herein.

240.   Inherent in the Joint Ventures and the IOA is the covenant of good faith and fair dealing.

241.   The implied covenant provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

242.   Put another way, the parties to a contract implicitly agree to deal honestly and in good faith in both the performance and the enforcement of their contract.

243.   Through the conduct described above, WMO and WMO LLC breached the implied covenant of good faith and fair dealing owed to the Plaintiffs.

## FROM THE BEGINNING WMO DID NOT ACT IN GOOD FAITH

244.   WMO executed a Joint Venture document with Landry for submittal to VW1.

245.   That Joint Venture resulted in the execution of a Time Charter by POMS with VW1 that included specific terms as to the PCG that WMO and WMO LLC agreed to through Zohner and Kristensen.

246.   The entire goal of the Parties was to seek out and obtain contracts to provide CTV services to those like VW1 and GE.  The JV for VW1 was the first success the parties that lead to the formation of POMS.

**WMO CONTINUED TO ACT WRONGFULLY
DURING THE COURSE OF PERFORMANCE**

247. WMO and WMO LLC lack of good faith has frustrated the sole purpose of POMS.
     Among other misconduct, WMO through Zohner failed to negotiate in a reasonable
     manner with the Plaintiffs; WMO and WMO LLC caused Plaintiffs to spend hundreds of
     thousands of dollars to obtain the VW1 and GE contracts; WMO and WMO LLC
     unilaterally and improperly withdrew from POMS after the Plaintiffs were successful in
     meeting every demand put forward by WMO and WMO LLC;  WMO and WMO LLC
     repeatedly used pretexts in an effort to extract concessions from the Plaintiffs so that they
     could obtain better terms or a better deal for WMO at the expense of the Plaintiffs.

248. In addition, WMO's course of conduct has effectively compelled POMS to fail.  WMO
     negotiated and agreed with the Plaintiffs as to financing structures, language and division
     of PCGs, and capital contributions.  For the sake of its convenience, WMO assertion that
     Zohner lacked corporate authority to act in terms of entering into the JV submittals to
     Vineyard Wind, the MOU, the IOAs, the Time Party Charters with GE and VW1.

249. Defendants breached of the implied covenant of good faith and fair dealing Plaintiffs
     suffered damages as will be demonstrated at trial.

**COUNT III
Breach of Fiduciary Duty- All Defendants**

250. Plaintiffs restate and realleges paragraphs 1 through 249 as if fully set forth herein.

**POMS WAS A CLOSELY HELD COMPANY**

251. The Parties were the only members of POMS.  Further, Zohner was a Director of POMS
     along with Landry and Jones.  Kristensen was a substitute Director in place of Zohner.

Zohner, Landry and Jones were executing documents for the benefit of POMS with VW1, GE and other third parties.

252.  Plaintiffs through Defendants' inducements, entered into JV for VW1, the MOU, the IOA for POMS and the Time Charter Party contracts with VW1 and GE based upon Zohner's and Kristensen's representations that WMO, and therefore WMO LLC, had the financial ability and desire to form and participate in POMS and that Zohner had authority to act on behalf of WMO.

253.  Zohner's actions and statements as then CEO of WMO instilled trust and confidence in Landry and TFIC to enter into the JV for VW1, the MOU, the IOA for POMS, the Time Charter Party contracts with VW1 and GE.  Kristensen's actions and statements as the COO of WMO instilled trust and confidence in Landry and TFIC to enter into the JV for VW1, the MOU, the IOA for POMS, the Time Charter Party contracts with VW1 and GE.   After all, WMO held itself out as a leader in the CTV and Wind Farm areas and Zohner and Kristensen founded WMO.

254.  By virtue of their relationship, the Defendants owed fiduciary obligations to the Plaintiffs and POMS.

255.  Defendants Zohner and Kristensen additionally breached their fiduciary duties by failing to disclose that Zohner lacked corporate authority to enter into any agreements concerning ventures in the United States.

256.  Defendants breached their fiduciary duties by withdrawing from POMS causing the loss of actual contracts to perform with VW1 and GE which in turn caused the Plaintiffs to suffer financial harm.  Defendants did not give the Plaintiffs an opportunity to replace Defendants from POMS and maintain the VW1 and GE contracts which were assignable.

## COUNT IV
## Fraudulent Inducement – All Defendants

257.   Plaintiffs restate and realleges paragraphs 1 through 256 as if fully set forth herein.

258.   The duty to refrain from using fraud to obtain a contract is separate and distinct from the duty to perform a contract already entered into.

259.   A fraud in the inducement claim relates to fraudulent representations made prior to the inception of the contract and made for the purpose of inducing the claimant to agree to the contract in the first place.

260.   WMO acting through Zohner and Kristensen made representations that WMO would perform with Plaintiffs in contracts to provide CTV and other vessel support services to those in the wind farm industry.

261.   Specifically, Zohner and Kristensen held WMO out as having the knowledge, skill and finances to engaged in the business that was being planned.

262.   Zohner, and with Kristensen's knowledge, went about the business of successfully obtaining contacts with VW1 and GE to provide CTV services through POMS.

263.   Zohner's actions were done without authority from WMO as stated by Schneider.

264.   Zohner's actions were done with knowledge of Kristensen who was intimately involved in the JV for VW1, the MOU, the IOA for POMS, the Time Charter Party contracts with VW1 and GE.  Kristensen did nothing to stop Zohner from this action nor did Kristensen take any steps to inform Plaintiffs of Zohner's lack of authority.

265.   Due to the Jones Act requirements Defendants made those statements to induce Plaintiffs to engage in an industry that the Defendants could not otherwise engage.

266.   These statements, as later stated by Defendants, were false and misleading because Defendants never intended to be involved with POMS, but rather other US maritime companies.

267.   Defendants knew the statements were false at the time made with the specific intent to induce Plaintiffs into the the JV, formation of POMS and securing U.S. wind farm business as described above.

268.   Defendants were using its relationship with Plaintiffs to gain an advantage with Foss and others as will be demonstrated at trial.

269.   Plaintiffs' reliance on Defendants' statements and representations was reasonable and justifiable under the circumstances and were also detrimental to the Plaintiffs as they entered into an agreement with WMO and WMO LLC when they could have entered into agreements with others resulting in the same financial result for the Plaintiffs.

270.   As a result, Defendants should be required to pay Plaintiffs money damages in an amount to be proven at trial sufficient to compensate Plaintiffs for their losses.

**COUNT V**
**Tortious Interference With Contractual Relations**
**All Defendants**

271.   Plaintiffs restate and realleges paragraphs 1 through 270 as if fully set forth herein.

272.   Defendants were aware of the contracts POMS had with GE and VW1 and therefore owed a duty to Plaintiffs.

273.   Defendants intentionally and maliciously interfered with those contracts for the purpose of harming POMS for the benefit of WMO of which Zohner and Kristensen, at all relevant times, were shareholders of WMO.

274. Defendant Zohner, and with Kristensen's knowledge, acted outside of Zohner's WMO corporate authority by entering into contracts.

275. Due to the Jones Act requirements Defendant Zohner and Kristensen's actions were driven to engage in an industry that the Defendants could not otherwise engage and secure the investment of another US Maritime company to the exclusion of the Plaintiffs.

276. Defendants Zohner and Kristensen's actions constitute actual malice towards the Plaintiffs after years of working with Landry.

277. As a direct and proximate result of Defendants' tortious interference, Plaintiffs have been damaged as will be demonstrated at trial.

## COUNT VI
### Fraud- All Defendants

278. Plaintiffs restate and realleges paragraphs 1 through 277 as if fully set forth herein.

279. The Defendants made false representations or omitted material information in violation of their express duty to disclose, namely Zohner's authority to act on behalf of WMO.

280. The Defendants knowingly did so for the purpose of inducing the Plaintiffs to engage in pursuing the contracts that were awarded as the Defendants could not obtain same on their own.

281. Either Zohner had authority to act on behalf of WMO or he did not.

282. At all relevant times, the Defendants lied to the Plaintiffs.

283. The Plaintiffs undertook actions to secure contracts and financing at a cost to them. Further, the Plaintiffs refrained from taking actions to obtain these contracts with entities other than WMO in reliance upon WMO's representations through Zohner and Kristensen.

284. As a result of the Defendants' actions Plaintiffs suffered damages by way of the loss of the failure of POMS and the loss of the contracts awarded to it.

285. The Plaintiffs damages as a result of the failure of POMS is as set forth above and as demonstrated at trial.

**COUNT VII**
**Negligent Misrepresentation – All Defendants**

286. Plaintiffs restate and realleges paragraphs 1 through 285 as if fully set forth herein.

287. During the Parties relationship, the Defendants supplied false information to the Plaintiffs to guide them in their business transaction and are subject to liability for the pecuniary loss caused to the Plaintiffs by their justifiable reliance upon the information as the Defendants failed to exercise reasonable care or competence in obtaining or communicating the information.

288. The Plaintiffs who suffered economic injury are entitled to recover against the Defendants who committed the tort of negligent misrepresentation in an amount that will be demonstrated at trial.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs Michael Landry, Treadwell Franklin Infrastructure Capital LLC, and Patriot Offshore Marine Services, LLC pray that this Honorable Court:

    a.    Enter Judgment in Plaintiffs favor on all counts;

    b.    Award damages to Plaintiffs on account of their actual losses;

    c.    Award Plaintiffs attorneys' fees and costs and such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs, Michael Landry, Treadwell Franklin Infrastructure Capital LLC, and Patriot

Offshore Marine Services, LLC demand a trial by jury on all claims.


Respectfully submitted
Plaintiffs'
By their attorney,

/s/ David S. Smith
David S. Smith, Esq.
BBO No.: 634865
Olaf Aprans
BBO No.: 670434
Farrell Smith O'Connell
Aarsheim Aprans, LLP
27 Congress St., Suite 109
Salem, Massachusetts 01970
Tel: 978-744-8918
Fax: 978-666-0383
dsmith@fsofirm.com
olaf@fsofirm.com

## CERTIFICATE OF SERVICE

I, David S. Smith, attorney for the Plaintiffs herein, hereby certify that I caused to have served a copy of the foregoing document upon all parties of record via the ECF system this 6th day of January, 2023.


/s/ David S. Smith
David S. Smith