**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| MICHAEL LANDRY, | ) | |
| TREADWELL FRANKLIN | ) | |
| INFRASTRUCTURE CAPITAL LLC, and | ) | |
| PATRIOT OFFSHORE MARINE | ) | |
| SERVICES, | ) | |
| LLC, | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
|  | ) | Civil Action No. 22-CV-11432-AK |
| v. | ) | |
|  | ) | |
| WORLD MARINE OFFSHORE A/S, | ) | |
| WORLD MARINE OFFSHORE LLC, | ) | |
| LARS CHRISTIAN ZØHNER, and | ) | |
| JIMMY KRISTENSEN | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |

## MEMORANDUM AND ORDER ON DEFENDANTS ZØHNER AND KRISTENSEN MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

**ANGEL KELLEY, D.J.**

Plaintiffs Michael Landry, Treadwell Franklin Infrastructure Capital LLC ("TFIC") and

Patriot Offshore Marine Services ("POMS"), bring suit against World Marine Offshore A/S and

World Marine Offshore LLC (collectively referred hereafter as "WMO"), Lars Christian Zøhner,

and Jimmy Kristensen.  [Dkt. 40].  The First Amended Complaint ("Complaint") alleges several

breaches and tortious acts resulting from a Massachusetts-Danish business partnership gone

awry.  Plaintiffs seek to recover over 18 million dollars in investments, expenses, lost profits and

other damages due to the fractured partnership and various breaches.  The Complaint alleges the

following counts against all Defendants: Breach of Contract (Count I); Breach of the Implied

Covenant of Good Faith and Fair Dealing (Count II); Breach of Fiduciary Duty (Count III);

1

Breach Fraudulent Inducement (Count IV), Tortious Interference with Contractual Relations (Count V); Fraud (Count VI); and Negligent Misrepresentation (Count 7).  Defendants Zøhner and Kristensen subsequently filed their Motion to Dismiss Plaintiffs' Complaint because of lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim.  [Dkt. 44]. WMO subsequently filed a notice of bankruptcy order stating the U.S. Bankruptcy Court for the District of Delaware "granted the Foreign Representative's request for a preliminary injunction staying the matter as to WMO A/S and LLC."  [Dkt. 63].  This notice effectively stayed all current proceedings as to WMO only.  [Dkts. 47 and 50].  Accordingly, WMO did not respond to the operative Complaint and the Court solely addresses Kristensen's and Zøhner's Motion to Dismiss at this juncture.

For the following reasons, Zøhner and Kristensen's Motion to Dismiss [Dkt. 44] is **PARTIALLY GRANTED** as to the claims against Kristensen and **DENIED** as to the claims against Zøhner.

I.      **BACKGROUND**

A.  **The Parties**

Landry is a mariner that resides in Marshfield, Massachusetts and is in the business of building and operating offshore windfarm support vessels, and established Patriot Offshore, Inc. ("POI") to further this endeavor.  [Dkt. 40 at ¶ 5, 20-21.  The instant matter involves Landry's engagement in a joint venture with WMO, a Danish corporation with a principal place of business in Esberg, Denmark, established in 2012.  [Id. at ¶¶ 8, 9, 11-12, 20-21, 23].  WMO portrayed itself to be a provider of many services concerning the "offshore wind market" to include, "crew transfer, offshore support, offshore standby services to ferry services" crew and cargo transfer, provides "high performance … Crew Transfer Vessels" and more.  [Id. at ¶¶ 24-

26].  At all relevant times, Zøhner, Kristensen, and four others held equal shares of 50%

ownership of WMO.  [Id. at ¶ 9].  The other 50% of WMO was owned by a Danish investment

group called WMO Shipping A/S.  [Id.].  WMO LLC is a Delaware limited liability company

and wholly owned subsidiary of WMO.  [Id. at ¶ 10].  Zøhner, a resident of Denmark, was

WMO's first CEO, however, was removed from that position in November 2021, but remained a

WMO shareholder.  [Id. at ¶¶ 11, 139, 140, 165].  He was replaced by the current WMO CEO,

Hans Schneider.  [Id. at ¶ 13].  Kristensen, a resident of Denmark, was the COO from WMO's

"inception" and upon his removal in November of 2021, became a member of WMO's Board of

Directors.  [Id. at ¶¶ 12, 139].  On March 8, 2021, the joint venture formed between Landry and

WMO (which was negotiated by Zøhner and Kristensen) to become POMS, an LLC organized

under Massachusetts law with a principal place of business within the district.  [Id. at ¶¶ 7, 38,

39].  Plaintiff TFIC is a Delaware Corporation with its principal place of business in Portland,

Maine that approached Zøhner and Kristensen about POMS and eventually became a member of

POMS in July of 2021.  [Id. at ¶¶ 6, 43-44].

### B.  Formation of POMS

On September 15, 2017, Landry, Kristensen, and Zøhner began to discuss plans to enter

the U.S. windfarm market.  [Id. at ¶ 29].  Landry needed the experience and financial backing of

a larger company like WMO.  [Id. at ¶ 31].  Likewise, WMO needed Landry to operate in

Massachusetts (or anywhere in the United States) as a foreign company owned by "non-United

States citizens."  [Id. at ¶ 30].  Together, Landry, Kristensen, and Zøhner formed a joint venture

where WMO provided the financing resources, financial information and proposals to clients,

along with "management expertise, Certification, Safety Management Systems, Vessel

Management Systems," and various certifications to operate the windfarm support vessels from

Massachusetts.  [Id. at ¶¶ 32, 34].  Zøhner and Kristensen were involved in the negotiation of the terms and structure of the joint venture that ultimately became POMS.  [Id. at ¶¶ 39, 41].  On August 30, 2020, Landry and Zøhner executed a Joint Venture Consortium Declaration on behalf of WMO and POI upon submitting a binding bid to Vineyard Wind, LLC ("VW") for a contract. [Id. at ¶¶ 35, 40-42].  In December 2020, the joint venture engaged a law firm to begin the compliance work to form POMS, and then on March 8, 2021, the certificate of organization for POMS and parent companies was filed with the Massachusetts Secretary of the Commonwealth. [Id. at ¶¶ 36, 38].  The structure provided that WMO had an "aggregate interest" of 49% in POMS.  [Id. at ¶ 39].  Thereafter, Zøhner marketed POMS in the U.S. East Coast market as a venture that WMO was 49% co-owner of.  [Id. at ¶ 37].

Once Zøhner notified VW—the contract that the joint venture had previously bid on— that POMS was officially formed, POMS was awarded the contract through negotiation efforts led by Landry and Zøhner.  [Id. at ¶¶ 40-42].  In July 2021, TFIC (a servicer and developer of infrastructure assets, financing, and other services) met with Zøhner and Kristensen to discuss a future partnership with POMS.  [Id. at ¶¶ 43, 46].  TFIC had no experience in any offshore industry and relied heavily on WMO, Zøhner, and Kristensen's experience and representations. [Id. at ¶ 47].  Based upon Zøhner, Kristensen and WMO's representations regarding the "profitability and success" of the windfarm industry, on August 31, 2021, the TFIC management committee approved a proposal to join POMS.  [Id. at ¶ 59].  TFIC's role was to lead financing and assist in raising capital.  [Id. at ¶¶ 47, 49, 60].  On October 8, 2021, Zøhner informed TFIC that WMO wanted to move forward with adding TFIC to POMS.  [Id. at ¶ 72].

### C.  Memorandum of Understanding and Operating Agreements

Between early October 9 and 11, 2021, Zøhner and TFIC drafted a Memorandum of Understanding ("MOU") that was executed by Landry, Zohner, and TFIC on October 15, 2021. [Id. at ¶¶ 80, 86; Dkt. 25-6 at 1[1]].  The purpose of the MOU was to "form a business partnership with shareholding by each of the Parties" in POMS to be managed by a board of directors that included Zøhner as director and Kristensen as a "substitute Director."  [Id. at 251; Dkt. 25-6 at 1].  The parties agreed to "jointly pursue successful execution of" projects and agreed to work exclusively with each other and not engage any business with third party firms without consent. [Id. at ¶¶ 113a, 194-196; Dkt. 25-6 at 2-3 ¶ 8.d; 5 ¶ 13].  Other important provisions included that Massachusetts law and jurisdiction applied to its terms and conditions; all parties agreed to commit an initial $559,000 equity funding, with WMO providing further equity funding at a "promoted percentage" of 55.88%; and a binding non-compete clause that prohibited parties from competing with POMS for windfarm business within the U.S. and its territories.  [Id. at ¶¶ 87, 113a, 194-196; Dkts. 25-6 at 1 ¶¶ 1, 2-3 ¶ 8.d; 21-6 at 7 ¶ 21].

TFIC and Zøhner jointly drafted an Interim Operating Agreement ("IOA") that was executed by Zøhner on November 9, 2021. [Dkt. 40 at ¶¶ 113-114, 117].  It shared similar terms as the MOU, such as the Massachusetts law and non-compete clauses.  Plaintiffs understood Zøhner to be the designated person to act on behalf of WMO for all POMS purposes, and Kristensen was his designated substitute.  [Id. at ¶ 123].  The IOA called for a 10-day notification before any "change of control" of a member through written notice.  [Id. at ¶ 113a.; Dkt. 25-9 at 3 ¶ 7.2].

---

[1] Version reviewable by the Court and parties located at sealed document 25-12.

### D. POMS Business Prospectives

In addition to the contract with Vineyard Wind Offshore Logistic Tender, POMS secured additional contracts due to "representations" made by Zøhner and Kristensen to various business. [Id. at ¶ 59; Dkt. 54-3 at 7].  On August 10, 2021, Landry and Zøhner signed a Letter of Intent on behalf of POMS with General Electric ("GE") to begin the "vessel engineering and design work" for the construction of two charter vessels.  [Dkt. 40 at ¶¶ 51, 52-53].  In October 2021, Zøhner represented to GE and Plaintiffs that WMO had the necessary capital to fund the two charter vessels.  [Id. at ¶ 93].  He provided a financial spreadsheet and advised that there was "sufficient equity available behind WMO," and that the Board of Directors from "both companies" confirmed the financial status with the banks.  [Id. at ¶¶ 93-94; Dkt. 54-3 at 7].  Additionally, Zøhner represented that there was €107 Million available for the projects, which was sufficient capital and that the "board of directors" confirmed the capital was in fact, sufficient.  [Id. at ¶ 94].  Zøhner and Kristensen followed up by circulating an "Investor Presentation" that made representations about funding, contracts and joint ventures WMO obtained, contracts that POMS acquired, the fact that WMO "actively owned" POMS, and that the Board of Directors, including Landry, Zøhner, and Stephan Jones of TFIC, and key personnel such as Kristensen operated POMS.  [Id. at ¶¶ 96, 98, 101-104].  On or around November 24, 2021, POMS entered into two "Charter Parties" with GE—each of the charter parties provided that WMO was to contribute its allocated share of financing.  [Id. at ¶¶ 133-134].  Zøhner executed the charter parties on behalf of WMO.  [Id. at ¶ 133].

On August 12, 2021, POMS entered into a Charter Party Agreement with Vineyard Wind 1, LLC ("VW1") to construct a crew transfer vessel at Gladding Hearn Shipyard by June 1, 2023. [Id. at ¶ 54].  The agreement indicated that WMO would provide financing for the construction

of the vessel to be delivered within 60 days of executing the agreement.  [Id. at ¶ 56].  POMS and Gladding Hearn Shipyard executed a letter of intent on August 12, 2021.  [Id. at ¶ 57]. WMO, at the direction of Zøhner and Kristensen, completed the first payment of $70,000 on August 18, 2021, in accordance with the agreement.  [Id.].[2]  WMO however was unable to make the second payment in September of 2021, so "WMO, Zøhner, Kristensen, and Landry agreed that Landry would capitalize POMS with his own money and submit to GH the LOI payment." [Id. at ¶¶ 61-63].

### E. Breach

Notwithstanding the POMS MOU and IOA, Defendants unilaterally sought partnership with various other firms, disregarding the exclusivity and non-compete clauses.  [Id. at ¶ 105]. No later than October 29, 2021, Zøhner entered discussions with the company, Foss Maritime, to obtain shares in WMO.  [Id. at ¶ 105].  Around November 3, 2021, Zøhner engaged Clarkson Shipping Company and began the "formal process for new shareholding and capital raising." [Id. at ¶ 108].  Also in November 2021, WMO removed all three WMO board members and replaced them with five new members, to include Kristensen, without notifying Plaintiffs as required by the POMS MOU and IOA.  [Id. at ¶¶ 113, 139].  On December 8, 2021, WMO informed Plaintiffs that Schneider had replaced Zøhner as CEO.  [Id. at ¶ 140].  Days later, on December 17, 2021, WMO notified Plaintiffs that it would no longer be performing its agreed upon financing in the GE charter parties.  [Id. at ¶ 147].  Schneider also informed Plaintiffs that Zøhner did not have the authority to execute the joint venture documents or enter any charter parties on behalf of WMO, nor did he have authority to agree to finance any of the projects.  [Id. at ¶¶ 144, 147].  Zøhner never received approval from the WMO Board and the WMO

---

[2] Dkt. 40 contains two ¶ 57.  This citation is referring to the second ¶ 57.

shareholders were not aware that Zøhner had executed POMS operating agreements on behalf of WMO.  [<u>Id.</u> at ¶¶ 144, 147a, 147b.].  Consequently, WMO would not support any corporate guarantees towards interim bridge funding in support of the funding of the new build vessels. [<u>Id.</u> at ¶¶ 144, 147a].  At the time of receiving this news, Plaintiffs had already invested $237,375.00 of their funds in order for POMS to execute the three contracts it had already entered with GE, Vineyard Wind and VWI.  [<u>Id.</u> at ¶ 145].

In late December, Zøhner informed Plaintiffs that he and Kristensen had been in unilateral discussions with Foss Maritime, however Kristensen assured Plaintiffs that Foss was "out of the picture."  [<u>Id.</u> at ¶¶ 153, 172].  Plaintiffs later discovered that Zøhner (and Schneider) continued to meet with Foss's parent company in Denmark, in January of 2022.  [<u>Id.</u> at ¶ 175].

### F.  WMO Resignation

In December of 2021, POMS attempted to mitigate losses suffered from WMO's breach by accommodating WMO's "new mandate" of seeking other partnerships with "US vessel-owning and operating companies" that could have an ownership interest in POMS.  [<u>Id.</u> at ¶¶ 150-152].  TFIC drafted an amended agreement that revised the finance strategy and partnership model that accommodated WMO's new terms, however, these efforts proved to be unsuccessful. [<u>Id.</u> at ¶¶ 151, 176, 186, 188, 191].  On January 7, 2022, Schneider initiated an emergency board meeting to address WMO working with POMS, and also informed GE's about the meeting.  [<u>Id.</u> at ¶¶ 177-178].  This caused GE to become "very concerned" given WMO's role.  [<u>Id.</u> at ¶ 179]. On January 9, 2022, TFIC and Landry sent a Demand and Notice letter to WMO to provide assurance of WMO's obligations to POMS.  [<u>Id.</u> at ¶ 184].  On January 12, 2022, TFIC and Landry proposed that WMO sign an agreement that would result in a commitment to finance POMS, however WMO refused.  [<u>Id.</u> at ¶¶ 184, 185- 187].  Instead, WMO was working on a

proposed agreement with other partners that would effectively cut out TFIC and Landry from the deal.  [Id. at ¶ 188].  Schneider had also arranged a meeting with GE that excluded Plaintiffs.  [Id. at ¶ 189].  Additionally, WMO confirmed partnership with Foss, notwithstanding the non-compete clauses in the POMS MOU and IOA.  [Id. at ¶¶ 190-191, 196-197].  Finally, on January 13, 2022, Landry and TFIC received notice that WMO was resigning from POMS.  [Id. at ¶¶ 199-200].  Landry and TFIC "rejected WMO's resignation."  [Id. at ¶ 202].  Due to WMO's departure, GE canceled its contract with POMS, causing POMS to liquidate other contracts.  [Id. at ¶¶ 207-208].  Due to WMO's decision to pull out of POMS to pursue opportunities with Foss and other US maritime companies, Plaintiffs suffered a financial loss over $18,237,700.00.  [Id. at ¶ 210].

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to state a claim for relief that is "plausible on its face" and actionable as a matter of law.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Reading the complaint "as a whole," the court must conduct a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the court must perform a close reading of the complaint to distinguish factual allegations from conclusory legal statements.  Id.  Factual allegations must be accepted as true, while legal conclusions are not entitled to credit.  Id.  A court may not disregard properly pleaded factual allegations even if actual proof of those facts is improbable.  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  Second, the court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged."  Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).

Dismissal is appropriate when the complaint fails to "allege a plausible entitlement to relief." Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)).

**III.   DISCUSSION**

Kristensen and Zøhner move to dismiss on the grounds that the Court lacks subject matter jurisdiction to hear the matter and lack personal jurisdiction over Zøhner and Kristensen. They also argue, alternatively, that Plaintiffs' claims fail because Defendants did not owe a fiduciary duty to Plaintiffs; Plaintiffs failed to plead fraud and fraudulent inducement with particularity; Defendants are not liable for tortious interference; and the integration clause in the relevant agreements bar the misrepresentation claim.  Plaintiffs assert the Court has both subject matter and personal jurisdiction over Defendants, and maintain they have stated plausible claims for all counts against Kristensen and Zøhner.  For the forthcoming reasons, the Court agrees that it has subject matter jurisdiction, specific personal jurisdiction over both Defendants, and that Plaintiffs have stated all claims against Zøhner, and the breach of fiduciary duty claim against Kristensen.

**A.     Subject Matter Jurisdiction**

Defendants argue that the Court lacks subject matter jurisdiction to hear the matter. Specifically, they argue that the addition of POMS—an entity that at one time included American and Danish citizens—as a Plaintiff in the Amended Complaint destroyed complete diversity.  The Court disagrees.

Relevant here is whether the requirements have been met for diversity jurisdiction. Diversity jurisdiction requires complete diversity of citizenship, meaning no opposite party may share citizenship with the other, and must include a controversy exceeding $75,000.  See 28 U.S.C. § 1332.  To determine whether complete diversity exists where limited liability

companies are the litigants, courts must first determine "the citizenship of all of its members." D.B. Zwirn Special Opp. Fund, L.P. v. Mehrotra, 661 F.3d 124, 125 (1st Cir. 2011).  Each member's citizenship and not the location of where the limited liability company is domiciled determines the entity's citizenship, even if this results in a company with multiple citizenships. Id.  If any two members on opposing sides share citizenship, diversity is destroyed.  See M & I Heat Transfer Prods, Ltd. v. Willke, 131 F. Supp. 2d 256, 260 (D. Mass. 2001).  Complete diversity must exist at the time the complaint is filed, however, it can be destroyed by parties' subsequent actions.  Am. Fiber & Finishing, Inc. v. Tyco Healthcare Grp., LP, 362 F.3d 136, 141-142 (1st Cir. 2004) (finding that plaintiff destroyed diversity when it amended its complaint and added a non-diverse party).

All parties agree that no WMO (Danish) member remains a part of POMS to date, nor did they at the time complaints were filed or any point thereafter.  Defendants instead ask the Court to essentially pretend that WMO is still a member of POMS because WMO failed to provide the 6-month notice of its resignation indicated by Massachusetts General Laws Chapter ("M.G.L. c.") 156c, §36.  Defendants argue, without case law or support, that WMO's resignation was essentially ineffective due to its failure to provide proper notice, despite Defendants admission that WMO has not been a member of, or operated as POMS since July 2022.  A plain reading of Section 36 indicates that if a member improperly withdrawals in violation of the statute or operating agreement, then the limited liability company may recover damages.  See M.G.L. c. 156c, §36.  Nothing in the governing statute speaks to the validity or invalidation of a resignation, should there be a failure to provide the requisite notice of the resignation. Accordingly, complete diversity existed at the time the Complaint and Amended Complaint were filed, and the time thereafter, providing the Court with subject matter jurisdiction.

## B.  Personal Jurisdiction

### 1.  Legal Standard

The question now, is whether the Court has personal jurisdiction over respectively, Kristensen and Zøhner, independent of the limited liability company.  Plaintiffs have the burden of showing that the Court has personal jurisdiction.  See United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001) (internal quotation marks and citation omitted) ("[I]t is plaintiff's burden to demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution.").  The district court may evaluate whether a plaintiff has met this burden by a number of methods, to include the "'prima facie' standard, the 'preponderance-of-the-evidence' standard, or the 'likelihood' standard." M-R Logistics, LLC v. Riverside Rail, LLC, 537 F. Supp. 2d 269, 274 (D. Mass. 2008).  Of these methods, courts have found the prima facie method to be "the most conventional," allowing the court to "consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction."  Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002) (quoting Boit v. Gar–Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir.1992)).  Plaintiff is required to proffer more than what is in the pleadings, and "is obliged to adduce evidence of specific facts … that, if credited, is enough to support findings of all facts essential to personal jurisdiction."  Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995).  While "the plaintiff must go beyond the pleadings and make affirmative proof … in evaluating whether the prima facie standard has been satisfied, 'the district court is not acting as a factfinder ….'"  Swiss Am. Bank, Ltd., 274 F.3d at 619 (internal quotation marks and citation omitted).  Rather the "court accepts the plaintiff's proffered and properly documented facts as true 'irrespective of whether

the defendant disputes them, and in so doing, construe[s] them in the light most congenial to the plaintiff's jurisdictional claim.'" AOP Orphan Pharms. AG v. Pharmaessentia Corp., No. CV 20-12066-MLW, 2021 WL 2516103, at *4 (D. Mass. June 18, 2021) (quoting Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007)).  Any facts submitted by defendants are considered and "become part of the mix" so long as they are "uncontradicted." Adelson, 510 F.3d at 48.

This method becomes less valuable when applied to "harder-to-call" cases" when there are "conflicting versions of the facts." Foster-Miller, 46 F.3d at 145.  The preponderance-of-the-evidence method places the court on a "factfinding mission … taking evidence and measuring the plaintiff's jurisdictional showing …." Id.  This method considers the circumstances of a matter and whether it is "unfair to force an out of state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring more of the plaintiff than a prima facie showing of facts essential to in personam jurisdiction." Id. at 45-46 (quoting Boit, 967 F.2d at 676).  A court may also consider the established record and whether it is "rife with contradictions" or conflicting evidence. Id. at 46.  This is especially appropriate where "special circumstances" exist or courts are considering imposing jurisdiction upon foreign litigants. Id. Under this standard, the court would conduct an evidentiary hearing where factfinding would be narrowed "to probable outcomes as opposed to definitive findings of fact, thereby skirting potential preclusionary problems" and providing more legitimacy to a finding that personal jurisdiction exists over a foreign defendant. Id.

While the Court is presented with a jurisdictional challenge from two foreign litigants, neither Zøhner or Kristensen have provided sufficient facts or (any) evidence for the Court to consider this jurisdictional matter "harder-to-call." See Foster-Miller, 46 F.3d at 145.  It is Plaintiffs' burden to proffer the necessary facts and evidence to establish jurisdiction, however,

the Court must also consider the circumstances that would require an evidentiary hearing as opposed to a prima facie analysis.  Id.  As Plaintiffs asserted at oral argument, Defendants had the opportunity to produce affidavits or produce any supporting documents that would dispute Plaintiffs' facts to establish that the record is "rife with contradictions" to justify an evidentiary hearing.  Id. at 146 (quoting Boit, 967 F.2d at 676).  Defendants have not done so, and the Court is unconvinced that discovery limited to jurisdiction will yield much return.  Accordingly, the prima facie standard is appropriate here.  See Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 712 (1st Cir. 1996) (discussing that the prima facie method is most appropriate where parties have not presented conflicting versions of facts).

### 2.  Specific, Personal Jurisdiction

There are two types of personal jurisdiction: general and specific.  Ace Am. Ins. Co. v. Oyster Harbors Marine, Inc., 310 F. Supp. 3d 295, 303 (D. Mass. 2018) (citing United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992)). General, personal jurisdiction is not a consideration here as no party is claiming that any Defendants engaged in "continuous and systematic activity' in the forum."  Daynard, 290 F.3d at 51 (citing United Elec., Radio & Mach. Workers of Am., 960 F.2d at 1088).  Rather the inquiry is whether "there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities" to satisfy specific, personal jurisdiction.  Swiss American Bank, Ltd., at 618 (internal quotation marks and citations omitted).  Specific, personal jurisdiction over an out of state or foreign resident must comport with statutory and constitutional, due process requirements.  See Moura v. New Prime, Inc., 337 F. Supp. 3d 87, 92–93 (D. Mass. 2018) (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 290 (1980)).  The Massachusetts

long-arm statue establishes that there must be an independent basis[3] for "jurisdiction over the individual officers of a corporation" separate and apart from jurisdiction over the corporation. Levesque v. Schroder Inv. Mgmt. N. Am., Inc., 368 F. Supp. 3d 302, 308 (D. Mass. 2019).  The "requirement for an independent jurisdictional basis may be satisfied when a corporate officer transacts in-forum business either in his personal capacity or solely on behalf of the corporation." Interface Grp.-Mass., LLC v. Rosen, 256 F. Supp. 2d 103, 105 (D. Mass. 2003) (emphasis in original) (citing Yankee Grp., Inc. v. Yamashita, 678 F. Supp. 20, 22-23 (D. Mass. 1988)).  No Massachusetts court has limited independent jurisdiction based on what is known as the "fiduciary shield doctrine,"[4] which shields officers carrying out their duties in their corporate capacity.  See Hopkins v. Yi, No. 4:18-CV-40197-TSH, 2019 WL 3547085, at *3 (D. Mass. May 31, 2019) (declining to recognize the fiduciary shield doctrine as a means to limit personal jurisdiction).

### i.   Massachusetts Long Arm Statute

Plaintiffs argue that the Massachusetts long arm statute has been satisfied because Zøhner and Kristensen have transacted business in the Commonwealth, supplied services or things in the Commonwealth by "developing POMS" and negotiating and executing contracts, including those with General Electric and Vineyard Wind, and soliciting business for POMS; and caused a tortious injury through misrepresentations.  The Massachusetts long-arm statute, M.G.L. c. 223A, § 3 allows for personal jurisdiction, so long as it fits within the confines of the federal Constitution.  Daynard, 290 F.3d at 52.  However, Massachusetts courts have held that the requirements of the long-arm statute "may not be circumvented by restricting the jurisdictional inquiry to due process considerations."  SCVNGR, Inc. v. Punchh, Inc., 85 N.E.3d 50, 55-56

---

[3] LaVallee v. Parrot-Ice Drink Prods. of Am., Inc., 193 F. Supp. 2d 296, 300 (D. Mass. 2002).
[4] Johnson Creative Arts, Inc. v. Wool Masters, Inc., 573 F. Supp. 1106, 1111 (D. Mass. 1983.

(2017); Hussain v. R.I. Hosp., No. CV 19-10513-PBS, 2019 WL 3546888, at *2 (D. Mass. June

12, 2019).  To satisfy personal jurisdiction under the Massachusetts long-arm statute, the

individual must have acted "directly or by an agent, as to a cause of action in law or equity

arising from" one of the eight enumerated categories detailed in M.G.L. c. 223A, § 3.  Hussain,

2019 WL 3546888, at *3 (quoting M.G.L. c. 223A, § 3) (internal quotation marks omitted).  At

the very least, the allegations and supporting evidence indicate that both Zøhner and Kristensen

had substantial roles in the operations of a Massachusetts LLC that bid to service other

Massachusetts corporations, and Defendants conducted business on behalf of this LLC.  Due to

their conduct, Plaintiffs' injury resulted within the Commonwealth.  Collectively, these

allegations and evidence satisfy at least four (4) of the eight (8) enumerated categories.  See

M.G.L. c. 223A, § 3(a)-(d) ("transacting any business", "contracting to supply services",

"causing tortious injury by an act or omission in … or outside this Commonwealth").

　　　　Zøhner and Kristensen argue however that their actions taken as "officers of a

corporation" are not sufficient to establish personal jurisdiction because they were not taken due

to "personal interests" or taken outside their scope of employment.  Specifically, Zøhner argues

that as CEO his interests never differed from that of WMO, nor did he act out of his scope of

employment as the "alter ego of WMO" and his communication, travel and business conducted

in Massachusetts was only done so on behalf of WMO.  Kristensen argues that for the same

reasons set forth by Zøhner, there is no basis for jurisdiction for his actions taken as COO.

　　　　 What is at issue here is whether something more is needed to establish personal

jurisdiction under the statute due to Zøhner and Kristensen's role in POMS and WMO.  For

personal jurisdiction, courts have looked to whether the employee was a "primary participant[] in

the alleged wrongdoing intentionally directed at the forum," whether the employee "derived

personal benefit from their contacts in Massachusetts and/or acted beyond the scope of employment." See M-R Logistics, LLC, 537 F. Supp. 2d at 280 (quoting LaVallee, 193 F.Supp.2d at 301-302). As CEO, Zøhner, was a primary participant in the formation of POMS, the agreements and representations made to POMS and other companies such as GE and VW, that were ultimately breached. Importantly, Plaintiffs have alleged that he had a specific, individual role as the source of many of the breaches alleged. For example, in October and November of 2021, he personally engaged in discussions with other companies that violated the POMS exclusivity and non-compete clauses. In January of 2022, Zøhner met personally with the company Foss Maritime, unilaterally, to organize a deal that violated the exclusivity clause and would personally benefit Zøhner and Kristensen as shareholders. The strongest indicator that at least some of these actions were conducted outside of Zøhner's scope of employment is that he engaged in these actions after WMO terminated his position as CEO, and in November of 2021. [Dkt. 40 at ¶139]. Further, Zøhner's replacement notified Plaintiffs that Zøhner lacked the authority to execute various joint venture agreements and charters on behalf of WMO—the definition of acting outside the scope of employment.

As for Kristensen, he also held an officer position and was and continues to be a shareholder. Kristensen is alleged to have been a part of the tortious Foss Maritime discussions in December, after he too was removed from his COO position. He also allegedly provided false statements to Plaintiffs related to the meetings and negotiations between Kristensen, Zøhner and Foss Maritime.

These allegations are more than sufficient to establish personal jurisdiction for former officers and shareholders, Kristensen and Zøhner. See M-R Logistics, LLC, 537 F. Supp. 2d at 280; Trans Nat'l Travel, Inc. v. Sun Pac. Int'l, Inc., 10 F.Supp.2d 79, 83 (1998) (finding personal

jurisdiction of the corporate president despite acting in the capacity as the corporate representative); see also Murphy v. Erwin-Wasey, Inc., 460 F.2d 661, 664 (1st Cir. 1972) (finding there is personal jurisdiction where defendants knowingly make false statements that are relied upon and the injury occurs in the Commonwealth); Calder v. Jones, 465 U.S. 783, 790 (1984) (finding jurisdiction exists over primary participants of wrongdoing).

    **ii.    Due Process**

    To meet the requirements under the long-arm statute, the court's jurisdiction must also comport with the requirements of due process. Motus, LLC v. CarData Consultants, Inc., 23 F.4th 115, 122 (1st Cir. 2022). The due process constitutional requirement concerns whether "an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" Daynard, 290 F.3d at 52 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471–72 (1985). Plaintiff must establish "three distinct components: relatedness, purposeful availment [or minimum contacts], and reasonableness." Adelson v. Hananel, 652 F.3d 75, 80-81 (1st Cir. 2011) (internal quotation marks and citations omitted).

    Plaintiffs have adequately pled relatedness and purposeful availment, and Defendants do not dispute or bother to address these two prongs in their briefs. Accordingly, the Court focuses on "reasonableness." When evaluating whether it is reasonable to exercise personal jurisdiction over a nonresident, or in this case a foreign defendant, the First Circuit has applied what are essentially prongs of fairness, otherwise known as the "gestalt factors." Nowak, 94 F.3d at 717 (citing Burger King Corp., 471 U.S. at 477). These factors consider whether:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective

resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Id. (citing Burger King Corp., 471 U.S. at 477).

As to the first factor, neither Kristensen or Zøhner have addressed in their briefs a specific burden or provided any explanation for why it would be burdensome to litigate in Massachusetts. Second, Massachusetts has an interest in adjudicating this dispute, because POMS was formed under Massachusetts law, Massachusetts law governs its affiliated agreements and contracts within the joint venture. See M-R Logistics, 537 F.Supp.2d at 279; see also Atl. Specialty Ins. Co. v. MCMC, LLC, No. 21-CV-11194-ADB, 2022 WL 3045576, at *4 (D. Mass. Aug. 2, 2022) (discussing Massachusetts choice of law in agreements provides a strong interest in litigating matter in Massachusetts). Additionally, Plaintiffs make a compelling argument that Massachusetts (and the United States in general) have a strong interest in ensuring that contractual agreements made with foreign entities will be honored and/or enforced, regardless of a defendant's foreign residence. During oral argument, Plaintiffs' counsel argued that in its infant stages of offshore, windfarm development in the United States, residents must rely upon foreign partnership for their expertise in the windfarm industry. For the industry to grow, residents need assurance that lawful business practices will be enforced to protect their investments. This rationale also ties into the third prong of the Plaintiffs' interest in obtaining "convenient and effective relief." Nowak, 94 F.3d at 717 (citing Burger King Corp., 471 U.S. at 477). Further, in this matter, where WMO is tied up in a foreign bankruptcy proceeding with no indication of when it will resolve, there is a strong interest to ensure Plaintiffs' ability to move forward in a timely matter to receive effective relief against the individual Defendants. Fourth, the most effective way to resolve this matter is to resolve it in Massachusetts as the state laws govern several, if not all, agreements. Lastly, for the reasons stated in the second factor,

litigation in Massachusetts does not interfere with any promotion of social policies but rather has the potential to enhance them.

### C. Fiduciary Duty

Zøhner and Kristensen move to dismiss Count III, breach of fiduciary duty, primarily on the grounds that neither member owed Plaintiffs a fiduciary duty due to the structure of an LLC. Further, they argue that any representations or actions made by Zøhner and Kristensen in which Plaintiffs relied upon, are insufficient to establish a fiduciary duty. Plaintiffs argue that by nature of their positions as officer and position as the subject matter experts within POMS, Zøhner and Kristensen owed a fiduciary duty.

A breach of fiduciary duty involves the internal affairs of a corporation to be governed by state law where it was incorporated. Mariasch v. Gillette Co., 521 F.3d 68, 72 (1st Cir. 2008); Freid v. Gordon, No. CIV.A. 09-10928-DJC, 2011 WL 1157891, at *3 (D. Mass. Mar. 25, 2011). Accordingly, Massachusetts law applies to the breach of fiduciary claims arising from the Massachusetts incorporated LLC. A viable breach of fiduciary claim requires plaintiffs to demonstrate: "(1) the existence of a fiduciary duty; (2) breach of that duty; (3) damages; and (4) a causal connection between breach of the duty and the damages." Baker v. Wilmer Cutler Pickering Hale & Dorr LLP, 81 N.E.3d 782, 789 (Mass. App. Ct. 2017). Massachusetts courts have found that like corporations, officers of limited liability companies and even stockholders owe a fiduciary duty. See Pointer v. Castellani, 918 N.E.2d 805, 815 (2009) (internal quotation marks and citations omitted) (finding that an LLC is analogous to a close corporation under the law with respect to fiduciary duties of its members, and similar to a close corporation, stockholders of an LLC "owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another [, that is,] the utmost good faith and loyalty.");

see also In re Bos. Grand Prix, LLC, 624 B.R. 1, 20 (Bankr. D. Mass. 2020) (finding that the officer of an LLC engaged in self-dealing and breached his fiduciary duty to the LLC, thus neither he nor the business he negotiated with was able to benefit); Donahue v. Rodd Electrotype Co. of New England, 328 N.E.2d 505, 512 (1975) ("Just as in a partnership, the relationship among the stockholders must be one of trust, confidence and absolute loyalty if the enterprise is to succeed.").

Plaintiffs have pleaded sufficient facts to establish Zøhner, as director of POMS, and Kristensen as a "substitute Director," owed a fiduciary duty to Plaintiffs. Zøhner and Kristensen are alleged to have taken lead roles in negotiating various contracts on behalf of POMS, advised POMS on various agreements as subject matter experts, and made representations of anticipated financial gains and contributions that induced several, if not all, the agreements at issue. Zøhner and Kristensen brought value to POMS through their experience, and coupled with the WMO name, brought credibility to the newly established LLC. As subject matter experts in the industry, it is reasonable that the type of faith and confidence entrusted in Zøhner's and Kristensen's leadership and advice created a fiduciary duty, notwithstanding their official title within POMS. See Doe v. Harbor Sch., Inc., 843 N.E.2d 1058, 1064 (2006) (internal quotes and citations omitted) ("A fiduciary duty exists 'when one reposes faith, confidence, and trust in another's judgment and advice.").

Defendants' remaining arguments for why breach of fiduciary duty[5] should be dismissed depend on questions of fact—that require the Court to accept Defendants' interpretation of the facts—that should be resolved through discovery. See In re Celexa & Lexapro Mktg. & Sales

---

[5] Defendants briefly address breach of contract in which they make a half-hearted, factual argument that Plaintiffs have misstated Zøhner's and Kristensen's role in the POMS and that the MOU obligations were not binding. Similar to the breach of fiduciary duty, assuming the Plaintiffs' facts as true at the pleading stage, these arguments fail.

Pracs. Litig., 769 F. Supp. 2d 11, 13 (D. Mass. 2011) (citing Langadinos v. Am. Airlines, Inc.,

199 F.3d 68, 69 (1st Cir.2000)) ("the Court must accept all factual allegations in the complaint as

true and draw all reasonable inferences in the plaintiff's favor").  The argument[6] that Plaintiffs

incorrectly titled Zøhner and Kristensen as "director" and "substitute directors" is a contested

fact.  The Court also notes, that while corporate leadership titles may inherently carry with it

fiduciary responsibilities and increased culpability for tortious actions, the Court finds the role

and function each Defendant actually carried out, notwithstanding whatever title is reflected on,

to be of equal, if not greater importance here.  Next, the arguments that Defendants were not

personally members of POMS is a contested fact and immaterial given their alleged role in

forming and carrying out POMS operations.  Defendants' argument that Landry had enough

expertise to *not* have to rely upon Defendant's advice or representations is yet another contested

fact.  Finally, Defendants' argument that they actually engaged in a "business transaction

conducted at arm's length," appears to be the most implausible argument in light of the lengthy

fact section detailing the extent Zøhner and, at times, Kristensen were intimately involved in

---

[6] Courts have determined that a leadership role such as directors and officers carry a fiduciary duty to the corporate entity by nature of the position by and of itself.  See Demoulas v. Demoulas Super Markets, Inc., 677 N.E.2d 159, 188 (1997) (discussing that as "directors and officers" of the corporation, defendants "owed a fiduciary duty"). Bos. Child.'s Heart Found., Inc. v. Nadal-Ginard, 73 F.3d 429, 433 (1st Cir. 1996) ("[The] basic standard of care is enhanced in situations when an officer or director engages in self-dealing.").  Furthermore, "the basic fiduciary requirement under Massachusetts law is that business partners and stockholders in close corporations refrain from acting out of '.... self-interest ....'" !Gay v. Axline, No. CIV.A.93–1491, 1994 WL 159426, at *5 (1st Cir. Apr. 26, 1994) (unpublished table decision).  Defendants argue they held no such role within POMS, while Plaintiffs argue they held titles equivalent to those requiring fiduciary duty.

POMS by assuming leading roles as decisionmakers, salesmen, and subject matter experts for POMS.  These arguments are insufficient to succeed on a motion to dismiss.

### D.  Fraudulent Inducement and Fraud

Zøhner and Kristensen argue that Counts IV, fraudulent inducement, and VI, fraud, should be dismissed for Plaintiffs failure to plead the claims with particularity.  While Plaintiffs bring each count as separate claims, both arise from the representations made by Zøhner regarding WMO's capabilities and commitment to various agreements.  A plaintiff "alleging fraud or mistake … must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Specifically, the allegations must indicate with particularity "the time, place, and content of an alleged false representation."  United States ex. rel. Kelly v. Novartis Pharm. Corp., 827 F.3d 5, 13 (1st Cir. 2016) (internal quotes and citations omitted).  Claims for fraud, must have "enough factual detail to make it apparent that the plaintiff's claims are far from 'groundless.'"  Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 51 (1st Cir. 2020).  Common law fraud and fraud in the inducement both require a showing that "(1) the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment."  Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 81 (D. Mass. 2004) (applying Massachusetts law for common law fraud); see Griffin v. Coghill, No. 17-CV-11619-IT, 2018 WL 1122361, at *7 (D. Mass. Mar. 1, 2018) (stating equivalent elements for fraud in the inducement under Massachusetts law); Katz v. Belveron Real Est. Partners, LLC, 28 F.4th 300, 310 (1st Cir. 2022) ("Under Massachusetts law, the elements for common law fraud and fraudulent inducement are the same.").  Additionally, a plaintiff must show that his reliance on the alleged misrepresentation was reasonable under the

circumstances.  Collins v. Huculak, 783 N.E.2d 834, 839 (Mass. App. Ct. 2003).  While courts

may address reasonability as a matter of law, it is generally a question of fact for the jury.

Gattineri v. Wynn MA, LLC, No. CV 18-11229-FDS, 2022 WL 123892, at *13 (D. Mass. Jan.

13, 2022).

      As for Zøhner's alleged fraudulent behavior, the Complaint alleges that

in October 2021, Zøhner assured GE that WMO had "all the necessary capital to fund the

project."  [Dkt. 40 at ¶ 93].  Specifically, he stated:

> I can confirm that the required equity is available from the shareholders behind
> the operating companies WMO (WMO Shipping company/Exes Invest a new
> shareholder as informed to GE 14 days ago) and TFIC. The Board of Directors in
> both companies have confirmed this to the banks we are discussing with at the
> moment and is the fundamentals from our side to be able to execute the contracts
> with GE.

Then, on October 27, 2021, Zøhner followed up with an email stating that the WMO Board of

Directors confirmed there was sufficient capital to fund the project with GE and that WMO was

expecting a new shareholder.  On November 24, 2021, POMS entered in two identical Charter

Party agreements with GE in which Zøhner signed on behalf of WMO, after assuring GE and

POMS that WMO had the necessary capital to successfully complete the project and would

assume the role as a financer of the project.  However, on December 17, 2021, Schneider stated

that not only was WMO not able to finance the project and provide any of the capital Zøhner had

promised, Zøhner never had the authority to execute any of the agreements.  WMO ultimately

pulled out of the agreement and Plaintiffs suffered sunk costs, among other damages.  These

allegations sufficiently plead the time, place, and circumstances in which Zøhner made false

representations that compelled Plaintiffs to enter agreements to their detriment.

      In contrast, the allegations against Kristensen fail to allege with particularity the time,

place and specific acts of fraud perpetrated by Kristensen.  For example, there are vague

allegations that Kristensen circulated investor presentations, however, no indication of the specifics of those presentations, who they were sent to exactly, whether Kristensen knew the information to be false—including what specific information was false—and whether those presentations were material to the agreements.  The Complaint alleges that he engaged in partnership meetings; and made representations about profitability, however, neglects to include specifically what false information Kristensen provided that Defendants relied upon to their detriment.  Accordingly, the fraud and fraudulent inducement counts against Kristensen only, are **DISMISSED**.

### E.  Tortious Interference with Contractual Relations

Defendants argue that Plaintiffs' claim for tortious interference with contractual relations (Count V) should fail because there are no allegations supporting that Zøhner or Kristensen acted with actual malice or improper motive.  Plaintiffs allege that Defendants intentionally and maliciously interfered with POMS contracts with GE and VW1.  A claim for tortious interference with contractual relations requires:

> [T]he plaintiff must prove that (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract [by inhibiting the third party's or the plaintiff's performance thereof, depending on the theory]; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

O'Donnell v. Boggs, 611 F.3d 50, 54 (1st Cir. 2010) (quoting Harrison v. NetCentric Corp., 744 N.E.2d 622, 632 (Mass. 2001).

Under Massachusetts law, improper motive or means is further defined as defendants who engage in "actual malice or a spiteful, malignant purpose, unrelated to a legitimate corporate interest."  Hamann v. Carpenter, 937 F.3d 86, 90 (1st Cir. 2019) (internal quotation marks and citations omitted).  For example, courts have considered "evidence of retaliation or ill will toward plaintiff" as support for actual malice or malignant purpose.  Cavicchi v. Koski, 855

N.E.2d 1137, 1142 (Mass. App. Ct. 2006).  "Improper means include violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, or defamation." Id.  Simply put, something more is needed other than the interference was intentional.  United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 23 (1990).

The element at issue here is whether there are sufficient allegations to meet the high standard of "actual malice."  As support for improper motive, the Complaint alleges that because Zøhner acted outside his corporate authority at WMO by entering into contracts, he acted with improper motive or means.  Plaintiffs also argue that there is "no heightened pleading" standard for tortious interference under Rule 9(b), however, provide no legal standard or support for this argument and simply claim what they have alleged is sufficient.  It is insufficient to simply claim improper motive or malicious intent.  See Hamann, 937 F.3d at 90 (discussing that simply alleging ill will or spite "standing alone, is too cursory and too conclusory to cross the plausibility threshold").  Plaintiffs must do more than parrot the standard as support that Zøhner and Kristensen acted with improper motive or means, and their Complaint and Opposition require too much speculation as to whether Kristensen acted with improper motive or means. See Ocasio-Hernández, 640 F.3d at 12 (internal quotation marks citation omitted) ("A plaintiff is not entitled to proceed perforce by virtue of allegations that merely parrot the elements of the cause of action.").  Plaintiffs fail to provide an argument for how Kristensen, apart from the actions of Zøhner, acted out of ill will, retaliation, discrimination or violated any law. Additionally, the inference that Kristensen (along with Zøhner) on behalf of WMO engaged Plaintiffs for (financial and personal gain) to satisfy the Jones Act[7] is also insufficient to establish improper motive.  See Portnoy v. 440 Fin. Grp. of Worcester, Inc., 938 F. Supp. 91, 94-

---

[7] The Jones Act bars foreign built and operated vessels engaging in U.S. domestic commerce.  See 46 U.S.C. § 55102.

95 (D. Mass. 1996) (quoting <u>King v. Driscoll</u>, 638 N.E.2d 488, 495 (1994) (finding "'personal

gain, including financial gain' is insufficient to show intentional interference" with contractual

business relations).  As for Zøhner, the allegations that he acted outside the authority of WMO,

supported by specific, fraudulent statements he made, in violation of common law and contract

law, makes it plausible that he used improper means.  <u>See</u> <u>Draghetti v. Chmielewski</u>, 626 N.E.2d

862, 869 (1994) (finding that misrepresentation is considered improper means, thus a letter

containing false statement that resulted in harm satisfied the improper means standard).

Accordingly, Count V is **DISMISSED** as to Kristensen, only.

### F.  Negligent Misrepresentation

Defendants argue that Plaintiffs' Count VII, negligent misrepresentation claim fails

because the POMS MOU and IOA both have integration clauses that "insulate the individual

Defendants from claims for any supposed negligent misrepresentations during negotiations."

[Dkt. 45 at 17-18] (citing <u>Sound Techniques, Inc. v. Hoffman</u>, 737 N.E.2d 920, 925-926 (Mass.

App. Ct. 2000)).   A viable claim for negligent misrepresentation requires "(1) in the course of its

business, (2) supplied false information for the guidance of others (3) in their business

transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable

reliance on the information, and (6) with failure to exercise reasonable care or competence in

obtaining or communicating the information."  <u>Monks v. Astoria Bank</u>, No. CV 16-12084-FDS,

2017 WL 2435278, at *6 (D. Mass. June 5, 2017) (quoting <u>First Marblehead Corp. v. House</u>, 473

F.3d 1, 9 (1st Cir. 2006).  Massachusetts courts have recognized however that various contractual

clauses may bar liability for negligent misrepresentation.  <u>Sound Techniques, Inc.</u>, 737 N.E.2d at

926 (2000).

In <u>Sound Techniques</u>, the court reasoned that disregarding merger clauses in light of negligent misrepresentation where an individual "has honest intentions" but fails to "exercise due care," undermines the contractual relationship.  <u>Id.</u>, 737 N.E.2d at 926.  Where there is "nothing in the evidence … that shows or even suggests that the integrity of the bargaining process was tainted by illegality, fraud, duress, unconscionability or any other invalidating case" it is appropriate to uphold merger clause.  <u>See id.</u>  Defendants ignore that courts have explicitly rejected any insulation from liability that may be provided by an integration clause, where there is such evidence of fraud and deceit.  <u>See</u> <u>Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.,</u> 329 F.3d 216, 226 (1st Cir. 2003).

Fraud and deceit are at issue here, and pleaded throughout the record, therefore the merger clauses have no effect here. Due to the lack of specific misrepresentations and fraudulent details alleged against Kristensen as previously explained, the claim for negligent misrepresentation Count VII is **DISMISSED** against Kristensen only.

## IV.    CONCLUSION

For the foregoing reasons, Zøhner and Kristensen's Motion to Dismiss is **GRANTED IN PART and DENIED IN PART**.  All counts with exception of Count II, Breach of Implied Covenant of Good Faith and Fair Dealing, and Count III, Breach of Fiduciary Duty are **DISMISSED** against Kristensen.  All claims against Zøhner remain.

**SO ORDERED.**

Dated: February 9, 2024                                   /s/ Angel Kelley
                                                          Hon. Angel Kelley
                                                          United States District Judge